Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:08 PM CDT

Clint Seemann, appellee, v.
Lisa Seemann, appellant.
___ N.W.3d ___

Filed May 24, 2024.    No. S-23-132.

1. **Divorce: Child Custody: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.

4. ____: ____. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

5. **Antenuptial Agreements: Property Division.** Spouses are able to contract around the general rules of equitable division by using a premarital agreement.

6. **Antenuptial Agreements.** As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure.

7. **Contracts: Intent.** When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract.

8. **Divorce: Property Division.** In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties.

9. ____: ____. In a marital dissolution action, there is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

10. ____: ____. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital.

11. ____: ____. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. If the separate property remains segregated or is traceable into its product, commingling does not occur.

12. **Expert Witnesses.** The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.

13. **Alimony: Time.** The reasonable duration of an alimony award depends on the specific facts in a given case, often the amount of time required to allow the recipient spouse to support himself or herself.

14. **Alimony.** Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. Rather, the primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support.

15. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result with the ultimate criterion being reasonableness.

16. **Divorce: Attorney Fees.** In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Douglas County: TRESSA M. ALIOTH, Judge. Affirmed in part, affirmed in part as modified, and in part reversed and remanded with directions.

John A. McWilliams, Frederick D. Stehlik, and Alexandria M. Bartels, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellant.

Christopher A. Vacanti and William L. Finocchiaro, of Vacanti Shattuck, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## I. NATURE OF CASE

Lisa Seemann appeals the decree entered by the district court for Douglas County dissolving her marriage to Clint Seemann. Lisa challenges various portions of the decree. Her assignments of error mainly focus on provisions regarding the classification, valuation, and division of the marital estate, but she also challenges the awards of alimony and attorney fees and costs, as well as other orders in the decree. We affirm the decree of dissolution in part with certain modifications; we reverse the division of the marital estate as ordered in the decree and remand the cause with directions to the district court to equitably divide the marital estate in accordance with this opinion.

## II. STATEMENT OF FACTS

Clint and Lisa were married in 2005. Clint filed a petition for dissolution of the marriage on February 4, 2021. Prior to the marriage, the parties executed a premarital agreement. The parties had three children during the marriage. One of the children, Aspen Seemann, died in 2016; custody and related matters concerning the other children were at issue in the dissolution proceedings.

After a trial in November 2022, the district court entered a decree of dissolution on January 30, 2023. The court ruled on, inter alia, various issues regarding parenting, the application of the premarital agreement, and valuation and division of the marital estate. The court's rulings and the facts related

thereto are set forth in our analysis below to the extent they are relevant to the issues raised on appeal.

Lisa appeals the decree of dissolution.

## III. ASSIGNMENTS OF ERROR

Lisa claims that the district court erred when it (1) failed to enforce a provision of the premarital agreement that required her consent to Clint's sale of certain shares of stock; (2) failed to make an equitable division of the appreciation of Clint's investment in property gifted to him during the marriage; (3) failed to make an equitable division of stock that was gifted to Clint but was commingled in an account that included stock that was marital property; (4) equally divided all but a portion of a liquidity access line of credit; (5) failed to consider the tax effect of assets awarded to her when making an equitable division of the property; (6) failed to assign a value to carpet and tile retained by Clint; (7) failed to assign a value for cash retained in property-owning entities awarded to Clint; (8) gave equal weight to brokers' opinions of value and appraisals by licensed appraisers when valuing certain real estate investments; (9) failed to assign a value to Clint D. Seemann, P.C.; (10) overvalued Lisa's retirement accounts; (11) required Lisa to make an equalization payment to Clint; (12) failed to award Lisa alimony in an amount greater than $8,000 per month for 48 months; (13) failed to require Clint to indemnify Lisa for any tax penalties that may be imposed for tax years prior to 2021; (14) failed to order Clint to pay an amount greater than $35,000 for Lisa's attorney fees and costs; (15) ordered Clint and Lisa to "'agree' and 'mutually agree'" on certain matters; (16) failed to include a right of first refusal for parenting time in the parenting plan; and (17) advised Clint and Lisa to remain in their current roles with respect to certain organizations they formed during the marriage.

## IV. STANDARDS OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether

there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

[3,4] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

## V. ANALYSIS

### 1. Paragraph 7 of the Premarital Agreement

For her first assignment of error, Lisa claims that the district court erred when it failed to enforce a provision of the premarital agreement that required her written consent to Clint's sale of certain shares of stock. Lisa contends that the court should have given her more than half of the remaining shares so that she would have half the number of shares that were owned before the sale. We conclude that the district court made an equitable division of the remaining shares of stock.

Paragraph 7 of the parties' premarital agreement provided, "As of the date of the signing of this agreement neither party will sell, pledge, mortgage, transfer, dispose of, or otherwise encumber any of the assets listed in this agreement without the prior written consent of the other party." The listed assets referred to in paragraph 7 was a listing of assets owned by the respective parties at the time of the marriage that they agreed would be considered marital property.

Clint's listing of assets included 26 shares of Berkshire Hathaway Class A stock that he owned at the time the parties married. During the marriage, in 2008, Clint sold 12 of the shares. Lisa did not execute a written consent to the sale of these shares. In the decree of dissolution, the district court divided the remaining 14 shares evenly between the parties. The court reasoned that "[b]oth parties were aware of the sale of [the 12] shares, and both received the benefit of the sale" because the "shares were sold to pay for indebtedness related to their home."

Lisa argues that she should have been awarded 13 of the remaining 14 shares rather than 7 shares because she had not executed a written consent to the sale of the 12 shares and she was therefore entitled to half of the original 26 shares. She contends that the district court's reasoning for dividing the shares equally was effectively a finding that either paragraph 7 had been waived or the premarital agreement had been amended solely by the conduct of the parties after the marriage. She argues that neither a waiver nor an amendment of a premarital agreement may be recognized based solely on the conduct of the parties. She further argues that any amendment of the premarital agreement during the marriage would effectively be a postnuptial property agreement, and she contends that under *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016), postnuptial property agreements are not authorized by Nebraska statutes and are void under Nebraska common law and public policy.

[5-7] Spouses are able to contract around the general rules of equitable division by using a premarital agreement. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). Neb. Rev. Stat. § 42-1004 (Reissue 2016) permits parties to a premarital agreement to contract with respect to, among other things, "[t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located" and "[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or

nonoccurrence of any other event." As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure. *Simons v. Simons, supra*. When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract. *Id*.

We do not read the district court in the decree as determining either that the parties amended the premarital agreement or that Lisa waived the application of paragraph 7. Instead, we read the district court as dividing the shares of stock that remained in the marital estate at the time of divorce. The district court determined that it was equitable to divide those shares equally rather than awarding Lisa a greater number of shares based on her allegation that Clint violated paragraph 7 when he sold some of the shares. We note that the premarital agreement provides in paragraph 8 that the listed assets "shall be considered as part of the marital property which shall be divided equally in the event of death or divorce." Consistent with this provision, the district court equally divided the 14 shares that remained in the marital estate at the time of the divorce.

As Clint notes, the premarital agreement neither provided a specific remedy for a breach of paragraph 7, nor directed how any asset sold in violation of the provision should be treated in a later divorce. Because the premarital agreement did not provide for such treatment, the premarital agreement did not override the general requirement that a dissolution court must make an equitable division of the marital estate.

The court effectively rejected Lisa's argument that an equitable division of the marital estate required that she be awarded a greater number of the remaining shares because

Clint had sold shares without her signed consent. The district court determined the division argued by Lisa was not equitable because the court found that both Clint and Lisa knew about the sale of the shares and that both benefited from the sale because the proceeds were used to pay indebtedness related to the marital home. The evidence supports these findings, and the value of the shares that were sold remained in the marital estate, which the court ultimately divided equally.

We conclude that the district court did not abuse its discretion when it divided the remaining shares evenly between the parties rather than awarding a greater number of shares to Lisa.

## 2. Division of Marital Estate

[8,9] Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id*. There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id*.

Lisa's next several assignments of error relate to the valuation and division of the marital estate, and she argues that because of the asserted errors, the court's division of the marital estate was inequitable. We review each of Lisa's specific assignments of error, and we then consider the effect of any errors on the overall division of the marital estate.

Certain of the property considered below was gifted to Clint during the marriage, and Lisa claims that the district court failed to make an equitable division thereof. Although she concedes that, pursuant to a provision of the premarital agreement, the value of such property at the time it was gifted

to Clint was his separate property, she argues that pursuant to another provision of the premarital agreement, the appreciation in value of such property after it was gifted to Clint was a marital asset that must be divided between the parties. Lisa's argument in this regard applies to two specific gifts of property: (1) a membership interest in a limited liability company (LLC) that owned two buildings and (2) shares of stock.

The two provisions of the premarital agreement that are relevant to Lisa's argument regarding property gifted during the marriage are paragraphs 5 and 8. Paragraph 5 provides that the parties

> agree that in the event of a divorce, dissolution or annulment of the marriage . . . neither party shall, by reason of the marriage, acquire or become vested with any interests or rights whatsoever in or to the other's party gifted or inherited property, or any part thereof; and each party hereby releases, disclaims, relinquishes and waives any and all rights, statutory or otherwise, inchoate or community, in and to the other party's gifted or inherited property, or any part thereof.

Paragraph 8 provides, in part, "Marital property shall also include property that results from the efforts of [the parties] during the marriage."

### (a) 75th and L Street, LLC:
### Gifted Property

During the marriage, Clint received various gifts from his father, including a membership interest in 75th and L Street, LLC, an entity that owned two commercial real estate properties. Lisa presented evidence to the effect that as of December 31, 2021, the membership interest had increased in value by $1,347,666 since Clint was gifted the membership interest in 2012.

The district court applied paragraph 5 to determine whether the membership interest in the LLC was Clint's nonmarital property. The court rejected Lisa's argument that the increase

in the value of the membership interest was a marital asset that should be divided equally between the parties. The court reasoned that Lisa's claim was contrary to paragraph 5, which specifically precluded Lisa from receiving "any . . . rights whatsoever" to assets that Clint received as a gift.

Lisa does not dispute the proposition that the value of the membership interest at the time it was gifted to Clint is his separate property pursuant to paragraph 5. But she maintains that the appreciation in value of the interest should have been included as marital property and divided between the parties. She relies on paragraph 8 and argues that her reading of the premarital agreement is consistent with the "active appreciation rule" as stated in our decision in *Stephens v. Stephens*, 297 Neb. 188, 206, 899 N.W.2d 582, 595 (2017).

In *Stephens v. Stephens*, we described the active appreciation rule as being that

> accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.

297 Neb. at 205-06, 899 N.W.2d at 595. We further stated that "the burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income" and that "the appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses." *Id*.

[10] After *Stephens v. Stephens*, we have adhered to the framework that any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). The original value of an asset may be nonmarital, while all or some portion of the appreciation of that asset may be marital. *Id*.

Lisa contends that paragraphs 5 and 8 read together incorporate the active appreciation rule. Clint argues that the district court correctly focused on the language of paragraph 5, providing a party shall not acquire "any . . . rights whatsoever" in the other party's gifted property "or any part thereof" and that such language precludes awarding any of the appreciation of the gifted property to Lisa.

We agree with Lisa's reading of the premarital agreement. Paragraph 8 requires that marital property includes "property that results from the efforts of [the parties] during the marriage." In *Stephens v. Stephens, supra*, we set forth the presumption that appreciation of nonmarital assets during a marriage is marital property unless a party can show, inter alia, that such growth was not due to the active efforts of either spouse. We thus treat appreciation of property during a marriage as property separate from the value of the underlying nonmarital asset. The district court read paragraph 5 broadly to include appreciation or growth in gifted or inherited property as a part of the original property. But paragraph 5 must be read with paragraph 8, which classifies "property that results from the efforts of [the parties] during the marriage" as marital property, rather than nonmarital property. We read the premarital agreement as treating appreciation of an asset that results from the efforts of the parties during the marriage as property separate from the original gifted or inherited property and classify such appreciation as marital property.

Therefore, under the premarital agreement, as under the active appreciation rule set forth in *Stephens v. Stephens, supra*, the relevant question is whether the growth in the asset resulted from the efforts of the parties during the marriage. Applying that understanding of the premarital agreement to the evidence in the case, we determine that the growth in the value of the membership interest in the LLC resulted from the efforts of Clint during the marriage. Clint testified that while his father retained a 1-percent membership interest in the LLC after his father gifted a 99-percent membership interest

to Clint in 2012, his father did not participate in the management of the properties; instead, Clint managed the commercial properties owned by the LLC. Clint testified that his management included dealing with tenants' leases and ensuring that the properties were in good repair. Clint's efforts contributed to the appreciation in the value of the LLC since 2012. We determine that under paragraph 8 of the premarital agreement, the appreciation in the value of Clint's membership interest in the LLC resulted from Clint's efforts, and that therefore, the appreciation in value should have been treated as marital property.

Lisa presented evidence that the increase in the value of the membership interest was $1,347,666, and Clint did not present evidence to the contrary. We therefore determine that given the efforts of the parties, the district court erred when it failed to include the $1,347,666 appreciation in the value of the membership interest as property in the marital estate.

(b) Class A Shares in Account 1988:
Gifted Property

In 2012, Clint's father also gifted 34 shares of Berkshire Hathaway Class A stock to Clint. The shares were deposited into an investment account referred to as "Account 1988." In 2016, Clint converted 1 of the 34 Berkshire Hathaway Class A stocks to Berkshire Hathaway Class B stocks and transferred those stocks to the parties' children and to a foundation created by the parties. The remaining 33 shares were valued at $14.256 million at the time of the dissolution trial in November 2022. The district court determined that the 33 shares were Clint's nonmarital property pursuant to paragraph 5 of the premarital agreement.

Lisa argues that the 33 shares were marital property because they were commingled in Account 1988 with other shares that were marital property. She also argues that the shares were marital property because the entirety of Account 1988 was pledged to secure debt that the court determined to be

marital debt. This debt is discussed further in connection with the next assignment of error. Lisa alternatively argues, as she argued regarding the membership interest in the LLC, that at least the appreciation in the value of the 33 shares should be included as marital property pursuant to paragraph 8 of the premarital agreement.

Clint argues that the 33 shares are readily identifiable as those that were gifted to him and therefore were not commingled with marital assets and that the use of the shares to secure debt did not change that analysis. He also argues that appreciation in value of the stock is covered by paragraph 5 of the premarital agreement and that the language of paragraph 5 precludes Lisa from receiving an interest in property gifted to Clint. We agree with Clint.

[11] Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021). If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that the property is nonmarital. *Id*.

At the time of the divorce, Account 1988 included 47 shares of Berkshire Hathaway Class A stock. This included the 33 remaining shares of the 34 that were gifted to Clint in 2012 and the 14 remaining shares of the 26 that Clint owned at the time of the marriage and that, as discussed above, were designated as marital property in the premarital agreement. We agree with Clint that the 33 shares that his father gave to him, and that were therefore his separate property, were not commingled with the shares in Account 1988 that were marital property.

Although held in the same investment account, the gifted shares were not "inextricably mixed with" the shares that were marital property because the marital and nonmarital shares were traceable into the account. See *id*. at 248, 965 N.W.2d at 23. Clint testified that the 34 shares were deposited

into Account 1988 when they were gifted to him in December 2012 and that one of the shares was converted into Class B stock in 2016, resulting in 33 of the 34 shares remaining in Account 1988 at the time of the divorce. He further testified that the 14 separate shares discussed earlier in this opinion that were marital property were not deposited into Account 1988 until February 2015, after 12 of the original 26 shares had been sold in 2008. The origin of each of the 47 Berkshire Hathaway Class A shares in Account 1988 was traceable.

Lisa asserts that because Account 1988 was used as collateral to secure debt that was determined to be partly marital debt and partly Clint's separate debt, the shares were comingled. The use of Account 1988 to secure debt does not change our determination that the origin of each of the Berkshire Hathaway Class A shares in the account was traceable as either marital or nonmarital property.

Finally, we reject Lisa's argument that the appreciation of the 33 shares since the time they were gifted to Clint should have been classified as marital property. As we determined above in connection with the membership interest in the LLC, under paragraph 8 of the premarital agreement, the increase in value of gifted property is considered marital property if such increase in value "results from the efforts of [the parties] during the marriage." Lisa generally argues that the increase in value of the shares resulted from Clint's efforts during the marriage, because he made investment decisions that allowed him to retain the shares rather than selling them.

We determine that such investment decisions do not constitute the sort of "efforts" referred to in the premarital agreement or in our precedent regarding the active appreciation rule. We have recognized that some assets are more subject to active appreciation, while others are more subject to passive appreciation. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). An investment in the stock of a company when a party to a marriage is not involved in the management or operation of the underlying company would generally appear

to be more subject to passive appreciation vis-a-vis the owner of such stock. Clint's testimony regarding the Berkshire Hathaway Class A shares indicated that his actions regarding the shares were limited to investment decisions such as whether to sell, convert, or keep the shares. Clint's testimony shows that he did not undertake efforts to maintain or increase the value of the underlying investment, but, rather, that he made the decision to keep the investment.

This evidence may be contrasted with Clint's testimony regarding the investment in the membership interest in the LLC discussed above. The main assets of the LLC were commercial real estate. In *Parde v. Parde, supra*, we recognized that it was incorrect to assume all appreciation in real estate was passive and that whether appreciation in real estate is active or passive depends on the facts and circumstances of each case. As discussed above, Clint's testimony regarding his investment in the LLC showed that he made efforts to maintain the underlying properties and leases, which efforts contributed to the increase in the value of the membership interest in the LLC during the marriage. These efforts went beyond merely holding onto the assets. In contrast, Clint's evidence regarding the Berkshire Hathaway Class A shares, including Clint's testimony and that of his financial advisor, indicated only that he made decisions to keep the stock and not that he made efforts to increase the underlying value of the investment.

We conclude that the district court did not abuse its discretion when it determined that the 33 gifted shares of Berkshire Hathaway Class A stock that were retained at the time of the divorce were Clint's separate property.

### (c) Liquidity Access Line: Debt

Lisa next claims that the district court erred when it equally divided all but a portion of the debt attributable to a liquidity access line of credit (LAL). In March 2014, an LAL was opened in Clint's name. The LAL was secured by Account

1988. At the time of the dissolution trial in November 2022, the balance on the LAL was $3,728,589. Clint conceded that $188,411.80 of the balance was his separate debt, but he asserted that the remaining balance was marital.

The district court generally agreed with Clint's classification of the LAL, and it stated that Lisa's suggested division of the marital estate and her testimony had identified the LAL as marital debt. Because a large portion of the LAL was related to the purchase of the marital home, the court ordered the marital home sold and the proceeds used to pay down the LAL. The court further ordered that Clint was to pay the $188,411.80 portion of the debt resulting from his separate expenses within 30 days after the house proceeds were applied. The court ordered that the remaining balance after the house proceeds and Clint's payment were deducted was to be paid equally by each party within 30 days after the house proceeds were applied.

Lisa contends that the equal division of the LAL was an abuse of discretion for three reasons. First, she argues that the LAL is "not a 'debt'" because it was structured such that Clint had the option to pay or not pay the balance and Clint's financial advisor testified that not paying the balance was "a 'sound strategy.'" Brief for appellant at 36. Second, she argues that even if the LAL is marital debt, an additional $207,161 that was classified as being related to marital expenses should have been classified as Clint's separate expenses. Third, Lisa argues that even if the LAL is marital debt, the court should not have divided the balance equally, because fairness and equity required that Clint should have been allocated a larger share of the debt.

Regarding Lisa's argument that the LAL was not true "debt," we note that Clint's financial adviser testified at the trial and that his testimony regarding not paying back the loan was more nuanced than Lisa's assertion that Clint never needed to pay back the LAL. The financial adviser testified that not paying back the LAL was a sound strategy "[i]f

[interest] rates [on the LAL] are super low" and the stock that serves as collateral for the LAL is "growing through the roof." The financial adviser noted, however, that when the LAL is not being paid back, the interest is being added to the balance of the LAL. In response to cross-examination by Lisa, the financial adviser testified, "You can decide to pay it back if you want at any point in time or you don't have to." But the financial adviser again cautioned that "if you don't pay it back, then the loan increases by the interest from the last month and will continue doing that monthly."

Based on this testimony, we reject Lisa's argument that the LAL was not a true debt. We do not think the financial adviser's testimony is properly characterized as suggesting that Clint was never required to pay back the debt. Instead, the testimony indicates only that there was not a set timetable for paying back the debt and that at times, it would make sound economic sense not to pay down the debt. However, the financial adviser noted that when the debt was not being paid, accrued interest was being added to the balance of the debt. We do not read any of the testimony as indicating that the LAL would never need to be paid back or that it was not a true debt.

Lisa also argues that $207,161 of the balance that Clint and the court classified as marital expenses should have been considered Clint's separate expenses. These expenses included payments totaling $62,327 that Clint made based on a court order in the present case that required him to pay Lisa temporary alimony and an advance on her share of the marital estate and to pay fees to her attorneys. The remaining $144,834 was for payments on a life insurance policy. Lisa argues that payments on the life insurance policy should have been classified as Clint's separate debt because Clint was awarded the cash value of the policy as part of his share of the marital estate.

Clint addresses Lisa's argument that $144,834 representing payments for life insurance premiums should be his separate

expense. He argues that payment of the premiums was an obligation for the joint benefit of the parties, and he cites his testimony at the trial to the effect that the policy was a $10 million second-to-die policy covering both Clint and Lisa that was taken out as part of their estate planning to benefit their children. He notes that while he was awarded the cash value in the policy, he was also ordered to be solely responsible for the premiums going forward. Clint makes no response to Lisa's claim that an additional $62,327 was for payments Clint owed to Lisa and her attorneys pursuant to the court's temporary order.

Regarding the debt attributable to life insurance payments, we determine that the evidence supports Clint's assertion that the payments were marital expenses. In addition to Clint's testimony as set forth above, the evidence regarding portions of the LAL classified as marital expenses or as Clint's personal expenses included a statement of activity in the LAL and an exhibit prepared by Clint's attorneys showing his classification of expenses. This evidence showed, inter alia, six payments between March 2017 and March 2022 that were described as life insurance and that totaled $144,834. The payments were made while the parties were still married and before the policy was awarded to Clint. Clint gave testimony showing the policy was part of the parties' estate planning to benefit the children, which could reasonably be considered a marital expense. Lisa does not cite any evidence she presented that would have shown that when the payments were made, they were solely for Clint's benefit. We determine that the district court did not err when it classified the debt attributable to these life insurance payments as marital expenses.

Regarding payments made pursuant to the court order, the district court entered an order in this case on March 9, 2021, in which, inter alia, it ordered Clint to pay Lisa financial support payments of $9,109 per month, to pay Lisa $25,000 as an advance payment toward division of the marital estate, and to pay $10,000 toward Lisa's attorney fees. The evidence

regarding the LAL showed three payments of $9,109 each to Lisa or to the clerk of the district court in March and April 2021, one payment of $25,000 to Lisa in March 2021, and one payment of $10,000 to a law firm in April 2021. We determine that because these were obligations Clint owed to Lisa under the order, these payments totaling $62,327 should have been considered as Clint's separate expenses rather than marital expenses.

The division of the LAL did not factor into the division of the marital estate per se. Instead, the court ordered the sale of the marital home and application of the proceeds of the sale to the LAL. The court further ordered that Clint should then pay the share of the LAL indebtedness attributable to his separate expenses and that the remainder of the debt should be paid equally by the parties. Because the $62,327 paid pursuant to the court order should have been considered as Clint's separate expenses rather than marital expenses, we modify that portion of paragraph 27 on page 14 of the decree that requires Clint "to pay the $188,411.80 within 30 days of the house proceeds being applied" to instead require Clint "to pay the $250,738.80 within 30 days of the house proceeds being applied."

### (d) Tax Effects

When the district court ordered the parties to pay their respective shares of the remaining balance of the LAL after the proceeds from the sale of the marital home were applied and Clint paid the portion of the balance attributable to his personal expenses, the court stated that "[b]oth parties are being awarded sufficient assets to pay his/her share." Lisa claims that the district court erred when it failed to consider the tax effects to which she would be subject if, to pay her share of the remaining balance, she were required to sell assets that were awarded to her.

Lisa focuses on two of the largest assets awarded to her—7 shares of Berkshire Hathaway stock and her retirement

accounts—and argues that if she were required to liquidate these assets to pay her share of the LAL debt, she would be subject to capital gains tax if she sold the stock and to a tax penalty if she took early withdrawals from the retirement accounts. She argues that Clint would not be subject to similar tax effects, because he was awarded income-producing assets, including nonmarital assets, that would provide him funds to pay his share of the LAL debt without incurring the same tax effects Lisa would incur. Lisa also repeats her assertion that Clint would not be obligated to pay back the LAL, but we rejected that argument above and do not consider it further in connection with this assignment of error.

Clint argues that the assets awarded to him were not liquid and that he testified at trial that he would incur tax consequences if required to liquidate assets, particularly his shares of Berkshire Hathaway stock. We agree that both parties potentially would incur tax consequences if required to liquidate assets. We see no abuse of discretion in the district court's alleged failure to account for the tax effects of liquidating assets when it ordered the parties to pay their respective shares of the remaining LAL balance.

### (e) Carpet and Tile

Lisa claims the district court erred when it failed to include in the marital estate the value of carpet and tile that was retained by Clint. During cross-examination by Lisa at the trial, Clint testified that during the marriage, some tile and some carpet had been purchased with the intent that it would be used in finishing the basement of the marital residence. He testified that the value of the carpet was $75,000 to $80,000. Clint further testified that the carpet and tile were never put into the basement and that they were still in his possession at the time of the dissolution trial.

In the dissolution decree, the district court found that Clint had "removed his personal items and a few household goods or miscellaneous property at the time he moved from the

family residence." The court further found that Lisa "remained in the family home and has retained the majority of the parties' household goods and miscellaneous property." The court found that the value of the items in Lisa's possession was $25,000. The court ordered that each party be "awarded the property in their respective possession." When setting forth the division of marital assets, the court listed $25,000 of "Household Furnishings" as being awarded to Lisa, but it listed no value for household goods, furnishings, or property being awarded to Clint.

Lisa argues that the court abused its discretion when it failed to assign a value to the carpet and tile retained by Clint. We determine that there was evidence to support the conclusion that Clint retained carpet and tile that had been purchased for the marital home and that Clint valued it at $80,000. Because the court assigned Lisa $25,000 for household furnishings in her possession but assigned no value for items retained by Clint, we determine that the court abused its discretion and should have included the $80,000 value of the carpet and tile shown by the evidence as marital property that was retained by and awarded to Clint.

### (f) Cash in Property-Owning Entities

The district court found that Clint owned "several commercial real estate investments with three other partners" and that he owned a 25-percent interest in each. The court determined that these real estate investments consisted of six real properties, and it valued the investments based on the valuations for the properties set forth by the parties' respective experts. From those valuations, the court deducted Clint's share of debt related to each respective property, and it also deducted a portion of the LAL balance that was borrowed for these investments. The court valued the "net equity" in these investments at $576,258 and awarded the investment to Clint at that amount. Lisa claims that the district court abused its discretion because it failed to include cash retained in the entities that owned the properties when it valued the investment.

Lisa presented testimony by a certified public accountant who opined regarding various issues related to Clint's investments. The accountant's testimony indicated that the six commercial real estate properties were owned by Clint and his fellow investors through four LLCs in which they were members. The accountant's testimony also indicated that as of December 31, 2021, each of the LLCs had a balance of retained cash in addition to the real property owned by the LLC. The accountant's testimony indicated that the total of Clint's share of the retained cash in the LLCs was $82,869.75. Lisa contends that the district court abused its discretion when it failed to include this retained cash when it valued the investments awarded to Clint.

Clint notes that the district court found that these investments should be valued as of the date of the trial in November 2022, rather than the date the dissolution action was filed in February 2021. He argues that Lisa presented only evidence of the cash retained in the entities on December 31, 2021, and that she failed to present evidence of cash retained at the date of trial, which was the valuation date chosen by the district court.

The court chose the date of trial as the date to value the investments, which choice Lisa does not dispute. Because there does not appear to be evidence in the record of valuation of cash retained as of the date of trial for valuation purposes, we see no error in the district court's valuation of the investments.

### (g) Broker's Opinions and Appraisals

Also related to these real estate investments, Lisa claims the district court erred when it gave equal weight to the testimony of the parties' respective experts regarding valuation of the properties. Each of the parties presented expert testimony regarding the valuation of the six commercial real estate properties owned by Clint and his fellow investors. Clint's expert was a commercial real estate broker. Lisa's experts

were licensed appraisers. The district court found both parties' experts to be credible and noted that they used similar valuation methodologies and arrived at reasonable values for the properties. The court stated that it was unable to give greater weight to one valuation over the other, and it therefore took an average of the two valuations to arrive at the fair market value for each of the properties.

Lisa argues that it was an abuse of discretion to give the respective experts equal weight, because her experts were licensed appraisers and Clint's expert was not. She asserts that because the court did not use her experts' valuation, Clint's investment in the properties was undervalued by $49,887.50. Clint argues in response that his expert's experience qualified him to opine on the valuation of the properties and that it was within the district court's discretion to credit his expert's testimony.

[12] In a dissolution proceeding subject to de novo review, we have said that the determination of the weight that should be given expert testimony is uniquely the province of the fact finder. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). We also said that a trial court is not required to accept any one method of valuation as more accurate than another accounting procedure and that a trial court's valuation of an LLC is reasonable if it has an acceptable basis in fact and principle. *Id*.

Under these standards, we determine that the district court's valuation of the investments was reasonable. The district court, as the fact finder, found both parties' experts to be credible, and we do not review that credibility determination. We see no abuse of discretion in the district court's decision to give equal weight to the respective experts' testimonies to arrive at its valuation for the investments.

#### (h) Clint D. Seemann, P.C.

Clint testified that he operated as a commercial investment broker through an entity he owned named "Clint D. Seemann,

P.C." (hereinafter P.C.). The accountant who testified for Lisa valued the P.C. at $27,768, based on cash retained in the entity less payroll tax obligations, on December 31, 2021. The district court did not include any valuation for the P.C. in the division of the marital estate. Lisa claims that the district court erred when it failed to include the P.C. in the marital estate.

We conclude there was evidence to support inclusion of $27,768 as a valuation of the P.C. in the marital estate. We note that some other marital assets were valued as of December 31, 2021, or some other date besides the date of trial. While the district court chose to value the investments in commercial properties discussed above as of the date of trial, it made no such finding regarding the P.C. We determine upon our de novo review that the court abused its discretion when it failed to include in the marital estate the $27,768 value of the P.C., for which there was evidence in the record.

### (i) Lisa's Retirement Accounts

Lisa owned two retirement accounts. As evidence, she presented statements for an individual retirement account (IRA) and a "simple" IRA that showed values as of October 31, 2022, of $1,389,121.16 and $41,599.82, respectively, for a total of $1,430,720.98. During cross-examination by Clint, Lisa responded in the affirmative to questions by Clint's counsel asking whether she had "borrow[ed] against [her] 401(k)" and whether she had "borrowed $50,000." In his proposed valuation of assets, Clint added a "Loan from IRA" balance in the amount of $50,000 to the balances of the IRA and the simple IRA and urged that Lisa's retirement accounts be valued at $1,480,720. Lisa's retirement accounts were treated as marital assets. The district court found in the decree that Lisa had "a balance of $1,480,720 in her IRA and Simple IRA as of October 31, 2022," and it included "Retirement accounts" valued at $1,480,720 as assets awarded to Lisa in the division of marital assets.

Lisa claims that the district court erred when it valued her retirement accounts at $1,480,720, rather than the $1,430,720. Lisa points to her evidence that showed the balance in the accounts on the specified date was $1,430,720. We note that in the decree, the court referred only to the balance of Lisa's retirement accounts as of October 31, 2022, and that it did not specify that it included $50,000 to represent an amount Lisa had borrowed. Therefore, it is unclear whether the court intended to include the loan in the value of the accounts or whether it was an error based on similarity of the numerals "3" and "8." In any event, we find that the evidence shows the sum of the balances in the IRA and the simple IRA was $1,430,720. Upon our de novo review, we do not find that Lisa's cross-examination testimony that she borrowed $50,000 "against [her] 401(k)" to be sufficiently clear evidence that $50,000 should be added to the balance that was shown in the evidence relating to her IRA and simple IRA on the relevant date. The testimony is not clear regarding when the amount was borrowed, whether and when it was paid back, or the purpose or use to which the borrowed funds were applied, and furthermore, the testimony refers to a "401(k)" rather than an IRA or simple IRA and to the amount's being borrowed "against" rather than "from" the account. We determine that Lisa's retirement accounts should have been valued at $1,430,720, as supported by her evidence, and that therefore, the court erred when it overvalued her retirement accounts by $50,000.

### (j) Equalization Payment

Lisa claims the district court erred when it required her to make an equalization payment. The court found that the marital assets awarded to Lisa totaled $4,596,220 and that the marital assets awarded to Clint totaled $4,552,178. The court ordered Lisa to pay Clint $22,021 to equalize the marital estate.

As we determined above, the court erred in failing to include certain assets in the marital estate and in its valuation

of assets included in the marital estate. These errors have a not insignificant impact on the size of the marital estate, the corresponding division of property awarded to each party, and the equalization payment, if any. We therefore reverse the portion of the order directing Lisa to make an equalization payment to Clint. As noted below, the district court will need to consider making a new equitable division of the marital estate, and such division may require a different equalization payment, if any, by one party or the other.

### (k) Resolution

To summarize our review of the valuation of the marital estate, we determine that the following assets should have been included in the marital estate: the appreciation and increase in the value of 75th and L Street, LLC, in the amount of $1,347,666; carpet and tile valued at $80,000; and Clint D. Seemann, P.C., valued at $27,768. Each of these assets either was determined by the district court to be Clint's nonmarital property or was shown by the evidence to be retained by Clint. We also determined that Lisa's retirement accounts, which were included in the marital estate and awarded to her, were overvalued by $50,000 and that they should have been valued at $1,430,720.

In its order, the district court stated that before the equalization payment, Clint was being awarded marital property of $4,552,178, Lisa was being awarded marital property of $4,596,220, and the total marital estate was $9,148,398. If the district court had treated the appreciation of 75th and L Street, LLC; the carpet and tile; and Clint D. Seemann, P.C., as marital assets awarded to Clint, and if it had properly valued Lisa's retirement accounts, the total marital estate would have been $10,553,832.

When the district court ordered Lisa to make an equalization payment to Clint, it effectively determined that the marital estate, as constituted by the court's valuation, should be divided equally between the parties. Our determination

that the court should have included additional property in the marital estate and that Lisa's retirement accounts were overvalued changes the composition and value of the marital estate. We therefore reverse the order of property division and remand the cause to the district court for an equitable division of the marital estate as it is constituted after the corrections that we set forth above. The district court should bear in mind both the proposition that as a general rule, a spouse should be awarded one-third to one-half of the marital estate, *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023), and any provisions of the parties' premarital agreement regarding division of the marital property in the event of divorce.

### 3. Alimony

The district court awarded Lisa alimony of $8,000 per month for 48 months. Lisa had requested that the court award her alimony of $10,000 per month for 96 months. The court stated that Lisa listed her monthly living expenses at $21,518 per month, or $258,216 annually. The court stated that Lisa would "need to find a way to live on a more realistic monthly budget or liquidate assets if she so chooses." The court stated that since the filing of the dissolution action, Lisa had been receiving "significant temporary support" that had been "sufficient to cover her monthly living expenses." The court stated that since the filing of the dissolution, Lisa "ha[d] made no strides to become re-employed," but that it was "now time for [her] to assist in her own support by re-entering the workforce."

Lisa claims that the district court abused its discretion when it awarded her only $8,000 per month for 48 months, rather than the amount and duration she had requested. Lisa argues that the four factors set forth in § 42-365 supported a larger alimony award. Lisa cites *Simons v. Simons*, 312 Neb. 136, 179, 978 N.W.2d 121, 154 (2022), in which we set forth

> four factors that are relevant to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4)

the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

Lisa contends that each of these factors supported a larger award of alimony to her. She also asserts that the district court's statement that she "ha[d] made no strides to become re-employed" was contrary to the evidence, including her testimony that she had a part-time job and was seeking full-time employment and that the reason she was previously unemployed was so that she could stay at home with the parties' youngest child.

[13-15] The reasonable duration of an alimony award depends on the specific facts in a given case, often the amount of time required to allow the recipient spouse to support himself or herself. *Karas v. Karas*, 314 Neb. 857, 993 N.W.2d 473 (2023). Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. Rather, the primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Id.* In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result with the ultimate criterion being reasonableness. *Id.*

We determine that the district court's award of alimony was not an abuse of discretion. Whether the district court's statement that Lisa "ha[d] made no strides to become re-employed" was supported by the evidence, we read the court's comments as setting forth its expectation that going forward, Lisa would be employed and would contribute to her own support. Based on this and other factors, including the temporary support Lisa had been receiving and Lisa's earning capacity, the district court determined that alimony of $8,000 per month for 48 months was adequate. Lisa's argument focuses on the reason she was not employed—raising a child not of school age—and

she does not appear to dispute that going forward, her ability to be employed and to contribute to her own support will be enhanced. We read the district court's award of alimony as properly focused on the amount of time and the amount of support that would be necessary to allow Lisa to secure her own means of support going forward.

## 4. Tax Penalties

Lisa claims the district court erred when it failed to require Clint to indemnify her for any tax penalties for tax years prior to 2021. Regarding prior years' tax returns, the district court ordered that "[i]f any tax return is amended and any taxes and penalties are due, [Clint] is responsible for payment of said taxes and penalties and shall pay and indemnify and hold [Lisa] harmless therefrom." Lisa argues that this order was insufficient because it should have applied to "any" liability or penalties that may arise for prior tax years and not just to those arising from an amended return. Brief for appellant at 49 (emphasis omitted). She specifically argues that the order should have covered liability or penalties arising from an Internal Revenue Service determination that could result in additional taxes owed. She notes testimony by the accountant she called as a witness to the effect that certain tax deductions taken by Clint in prior years were questionable and may not withstand scrutiny by the Internal Revenue Service.

We read the district court's order in this respect to be sufficient to address Lisa's concerns. The district court made Clint responsible for "any taxes and penalties" that are due "[i]f any tax return is amended." We read this order as broadly referring to any amendment of a prior tax return, whether such amendment is initiated by the parties or by an Internal Revenue Service determination. We find no abuse of discretion in this provision of the decree.

## 5. Attorney Fees and Costs

In the decree, the district court acknowledged that it had previously awarded Lisa attorney fees of $10,000, and it

ordered Clint to pay an additional $25,000 in attorney fees to Lisa. Lisa claims the award of attorney fees was an abuse of discretion.

Lisa had requested an award of attorney fees and costs, and she presented evidence of fees and costs in the amount of $89,245.39, as well as fees to her accounting expert in the amount of $17,030. She argues that the district court's award of $35,000 was insufficient because time-consuming pretrial proceedings, including the hiring of experts, were necessitated by Clint's substantial financial holdings and because the case involved novel issues. She also argues that the equities in this case require a greater award to her because the parties had "vastly inequitable resources available for litigating their divorce." Brief for appellant at 52.

[16] In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Cornwell v. Cornwell*, 309 Neb. 156, 959 N.W.2d 243 (2021). While the record demonstrates that this divorce involved significant pretrial proceedings and involved complicated, if not novel, issues, the record also shows that both sides raised issues that contributed to the complexity of the case. Although the parties possess different resources, the equities do not necessarily require that Clint needed to pay all of Lisa's attorney fees. Given these circumstances and this reasoning, we cannot say that the district court's decision to award fees and costs totaling $35,000 was an abuse of discretion.

### 6. Orders to "Agree" and "Mutually Agree"

Lisa claims that the district court erred when it ordered the parties to "'agree' [and] 'mutually agree'" on certain matters.

Brief for appellant at 53. The court determined that the sale of the marital residence was necessary to pay down significant debt. The court ordered that the residence "be placed for sale by a mutually agreed upon real estate agent at a mutually agreed upon price." The court also ordered the parties to share costs "for the children's reasonable and agreed upon necessary expenditures" and for "any reasonable and agreed upon necessary direct expenditures for the minor children."

Lisa argues that because there was evidence that "financial disputes were a point of contention during their marriage," the court should not have ordered them to agree on these matters. *Id*. at 53. She argues that "at the very least, the court should have provided terms for Clint and Lisa to follow in the event that they could not reach an agreement." *Id*.

Clint argues in response that it is standard and customary for a court to order parties to mutually agree on certain issues and that if the parties cannot agree, the remedy is for the parties to present the issue for determination by the court.

The district court was in a better position than an appellate court to determine whether the parties could come to agreement on these issues, and we defer to its discretion on the matter. As Clint argues, such orders are common and remedies are available if the parties find themselves unable to agree. We see no abuse of discretion in the district court's orders requiring the parties to agree on certain matters.

### 7. Right of First Refusal
### for Parenting Time

Lisa claims that the district court erred when it failed to include a right of first refusal for parenting time in the parenting plan. The parties participated in mediation to develop a parenting plan. However, they could not reach agreement on whether the parenting plan should include a right of first refusal for parenting time. In the decree of dissolution, the district court found that "the parties have effectively cooperated when unavailable to care for the children and there is no

need to include [a right of first refusal] as an Order" or as part of the parenting plan.

Lisa argues that the court erred when it failed to include a right of first refusal in the parenting plan because the parties both agreed that such a practice was in the children's best interests. She notes that Clint agreed to the concept and that he objected only to the "formalization of the right of first refusal in the parenting plan." Brief for appellant at 54. Clint asserts in response that the right of first refusal was unnecessary and that he had testified to that effect at the trial.

On this matter, we also defer to the district court's determinations, because it was in a better position than an appellate court to determine whether a right of first refusal was necessary and whether the parties could cooperate on these matters. We see no abuse of discretion in the district court's decision not to include a right of first refusal.

### 8. Issues Related to Nonparty Entities

Lisa finally claims that the district court erred when it ordered Clint and her to remain in their current roles within certain entities they formed during the marriage. After the parties' son Aspen died from drowning, the parties formed the Aspen Drake Seemann Foundation, as well as Slash, LLC, which is owned exclusively by the aforementioned foundation. Lisa is the president of the foundation, and Clint is a member of its board. In the decree of dissolution, the court advised the parties to remain in their current roles with the foundation and Slash and to honor the intent of the foundation and refrain from taking action detrimental to the foundation.

Lisa argues that the district court's orders related to the foundation and Slash, LLC, were improper because neither the foundation nor Slash, LLC, is a party to this action and because the court therefore lacked jurisdiction to mandate that Clint and Lisa remain in their current roles with the nonparty entities.

Clint argues in response that the reasonable interpretation of the district court's order is that it does not bind or affect the foundation or Slash, LLC, in any way and that instead, it concerns only the parties themselves and advises them to remain in their roles and to honor the intent of the foundation. We agree with Clint.

Although we agree with Lisa that the district court did not have authority over these entities, we agree with Clint that the decree can be read as governing only the behavior and actions of the parties—Clint and Lisa—with respect to their own and each other's roles in the organizations. Given our understanding that the order is directed only as to the behavior of the parties, we see no abuse of discretion.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's decree of dissolution except as indicated below. We determine that the provision of the decree regarding paying down the LAL debt should be modified to require Clint to pay $250,738.80, rather than $188,411.80, after the proceeds of the sale of the marital home have been applied and before the parties equally share responsibility for the remaining LAL debt. We also determine that the marital estate should have included the increase in the value of Clint's membership interest in 75th and L Street, LLC, in the amount of $1,347,666; carpet and tile valued at $80,000; and Clint D. Seemann, P.C., valued at $27,768, and that Lisa's retirement accounts should have been valued at $1,430,720, rather than $1,480,720. We therefore modify the marital estate as set forth in the decree to include these additional marital assets and corrected valuations. We reverse the division of the marital estate as ordered in the decree, including the order for Lisa to make an equalization payment to Clint, and remand the cause for the district court to determine an equitable division of the marital estate as it is constituted after modification to correct these noted errors. The district court should bear in mind both the

proposition that as a general rule, a spouse should be awarded one-third to one-half of the marital estate, *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023), and any provisions of the parties' premarital agreement regarding division of the marital property in the event of divorce.

AFFIRMED IN PART, AFFIRMED IN PART
AS MODIFIED, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.