IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STRAUSS V. STRAUSS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ERIC E. STRAUSS, APPELLANT,

V.

CAITLIN K. STRAUSS, APPELLEE.

Filed April 29, 2025.    No. A-24-570.

Appeal from the District Court for Seward County: JAMES C. STECKER, Judge. Affirmed.

Alex M. Lierz, of Nebraska Legal Group, for appellant.

Krista M. Carlson, of Carlson Family Law, P.C., L.L.O., for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Seward County District Court dissolved the marriage of Eric E. Strauss and Caitlin K. Strauss. Eric appeals the district court's decision to award physical custody of the parties' daughters to Caitlin. He also challenges the court's valuation and distribution of the marital estate, its award of attorney fees to Caitlin, and its decision not to find Caitlin in contempt for violating an anti-hypothecation order. We affirm.

## II. BACKGROUND

Eric and Caitlin were married in June 2013. They had two daughters, one born in 2014 and the other in 2016. Eric also had an older son from a previous relationship. The parties separated in August 2020. Caitlin continued to live in the marital home in Bee, Nebraska, and Eric moved in with his parents in Lincoln, Nebraska.

In December 2020, Eric filed a complaint for dissolution of marriage. Caitlin filed an amended answer and "counter-complaint." Both parties sought custody of the children, child support, division of assets and liabilities, and attorney fees.

Following a hearing, the district court entered a temporary order on January 12, 2021. The court granted the parties joint legal and physical custody of the children. Eric was to have "primacy in decision-making in matters relating to religion and activities," and Caitlin was to have "primacy in decision-making in matters relating to education and medical." Each party was to have parenting time every other week with transitions to occur on Fridays at 6 p.m.; a holiday parenting time schedule was also established. The parties were to complete mediation within 60 days.

On January 22, 2021, the district court entered a "Hypothecation Order" based on the joint stipulation of the parties. As relevant to this appeal, the parties were restrained from "selling, transferring, encumbering, hypothecating, concealing or in any way disposing" of any personal property located on the premises of the marital residence, or the assets of "Strauss Ag LLC, or wherever the personal property may be located."

Numerous motions were filed over the next couple of years, but as relevant to this appeal, on October 24, 2023, Eric filed a motion for an order to show cause. He alleged that Caitlin was in contempt of court for failing to follow the temporary order and the "Hypothecation Order" in various ways. As relevant here, he alleged that Caitlin sold a "1983 Peterbilt semi cabover." A show cause hearing began in January 2024 and then continued at the time of trial.

Trial was held in February and May 2024. Several witnesses testified, including Eric and Caitlin, and numerous exhibits were received into evidence. The evidence will be set forth as necessary later in our analysis. However, we note that the district court orally stated on the record that it was not going to find Caitlin in contempt on any of the issues, and that it would deal with each party's sale of a vehicle in the overall division of property.

On June 27, 2024, the district court entered a decree dissolving the parties' marriage. The court awarded the parties joint legal custody of their children. Physical custody was awarded to Caitlin, subject to Eric's reasonable rights of parenting time. Pursuant to the attached parenting plan, Eric was to have regular weekly parenting time every other weekend from Thursday until Monday; during the summer months, the parties had parenting time on an every-other-week rotation; and a holiday parenting time schedule was also established. Eric was ordered to pay Caitlin $762 per month in child support for the two children.

The district court also valued and divided the parties' property and debts, including farm equipment and the marital residence. Eric was ordered to pay an equalization payment of $156,012.12 to Caitlin. He was also ordered to pay her $5,000 for attorney fees.

On July 9, 2024, Eric filed a "Motion to Reconsider, to Alter/Amend, and for New Trial." He filed a motion to withdraw that motion on August 1; the district court sustained his motion to withdraw on August 2.

Eric filed his notice of appeal on July 29, 2024, stating his intent to appeal the district court's decree dated June 27, 2024.

### III. ASSIGNMENTS OF ERROR

Eric assigns, reordered and restated, that the district court erred in (1) awarding Caitlin primary physical custody of the children, (2) applying an active appreciation analysis to find that

certain farm equipment lost its premarital classification and including the entire value of the equipment in the marital estate, (3) valuing the marital residence and not including the insurance proceeds for home repairs in the marital estate, (4) failing to equitably divide the marital estate, (5) awarding attorney fees to Caitlin, and (6) failing to find Caitlin in contempt for violating the anti-hypothecation order and failing to require her to reimburse him for the sale of his premarital property.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed are reviewed for abuse of discretion. *Becher v. Becher*, 311 Neb. 1, 970 N.W.2d 472 (2022).

## V. ANALYSIS

### 1. JURISDICTION

Caitlin questions whether Eric has filed a timely appeal from a final order in this case because he did not file a new notice of appeal after the district court sustained his motion to withdraw his "Motion to Reconsider, to Alter/Amend, and for New Trial" on August 2, 2024. See Neb. Rev. Stat. § 25-1912(3) (Cum. Supp. 2024) (running of time for filing notice of appeal shall be terminated by timely motions for new trial, to alter or amend judgment, or to set aside verdict or judgment; new notice of appeal shall be filed after entry of order ruling on motion).

The district court's decree was entered on June 27, 2024, and Eric's notice of appeal was filed on Monday, July 29, 2024; this was within the statutory 30 days. See, § 25-1912(1) (notice of intent to appeal shall be filed within 30 days after entry of judgment, decree, or final order); Neb. Rev. Stat. § 25-2221 (Cum. Supp. 2024) (how to compute time). While Eric did file a motion to alter or amend and for new trial on Tuesday, July 9, 2024, his motion was not filed within 10 days of the June 27 decree and was therefore not timely. See, Neb. Rev. Stat. § 25-1144.01 (Reissue 2016) (motion for new trial shall be filed no later than 10 days after entry of judgment); Neb. Rev. Stat. § 25-1329 (Reissue 2016) (motion to alter or amend judgment shall be filed no later than 10 days after entry of judgment). Because Eric's motion was not timely, it did not toll the appeal time of the decree and is irrelevant for jurisdiction purposes.

Eric's notice of appeal of the decree was timely filed.

## 2. CUSTODY

Eric assigns that the district court abused its discretion in awarding Caitlin primary physical custody of the minor children "after finding both parties are fit and proper persons to be awarded the physical and legal custody of the children." Brief for appellant at 7.

### (a) General Principles of Law

When deciding custody issues, the court's paramount concern is the child's best interests. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap v. Kashyap, supra*.

### (b) Trial Testimony

Caitlin testified that when the parties were married, she was the one who primarily took care of the children. She also said that Eric spanked the girls too hard, and he bit one of the girls when she was a toddler. And she personally observed him give the girls alcohol when the oldest was "[u]nder five" and the youngest was "[u]nder three." When Caitlin told him not to do that, Eric's response was that "his dad gave it to him when he was little, so he could give it to his kids."

According to Caitlin, Eric's son sexually abused their oldest daughter in July 2020 (the daughter was 5 years old at the time; Eric's son was 13 years old). The daughter told Caitlin that Eric's son touched her vagina, and she described physical pain. When Eric asked his son about it, his son denied it. Caitlin said that Eric did not want to call the police and said they could handle it "'within our family.'" Caitlin stated that Eric's parents did not believe that it happened and did not want her to call the police to report it. According to Eric, his son pulled down the pants of one of the parties' daughters and "looked"; Eric and Caitlin reported it through the Child Advocacy Center. Caitlin confirmed that the incident was investigated by the Child Advocacy Center, the abuse was substantiated, and Eric's son was involved with the juvenile court. Eric testified that a

security system was put in the house "on all the doors" and he had not allowed his son to be alone around the parties' children since the incident.

Caitlin filed for a protection order against Eric on December 28, 2020. She said that on December 18, Eric came to the home unannounced, saying he wanted to talk. Caitlin did not want to talk, and Eric cornered her and grabbed her arms; she had bruising as a result of the incident. The parties' oldest child was present in the home.

There was also testimony about an incident that occurred the day before Mother's Day 2021. Caitlin testified that she had been to a wedding in the afternoon and then went to Nathaniel Emons' home, "[t]wo houses away" from her home. Eric and his family were at Caitlin's home that day retrieving some of his things; Caitlin said that they were supposed to be gone by 5 p.m. "[A]round 5:30," Caitlin was walking back to her house when "Eric and his sister were, like, running at me, telling me I was intoxicated, I was a giant whore, I was on drugs, I was high." Eric pushed her, and his sister shoved her phone in Caitlin's face. Caitlin picked up an empty pop can, threw it at them and said, "I'll [f***] you up." "Eric hit me in the face, his sister kept -- she just kept screaming at me, and I was screaming back. And to get him to stop doing what he was [d]oing, I grabbed her hair, because I thought if he can concentrate on her, he would stop . . . hitting me." She said Eric's father "came from the other side of the shed" and "choked" her; "[t]he first time . . . he, like, put his whole arm around my neck" and "[t]he second time he . . . put his two thumbs in my throat." (Eric's father testified that he "pulled" Caitlin off his daughter.) Caitlin "assumed she passed out" and she "was on the ground" when "[h]is brother-in-law . . . started kicking me in the head and the ribs." Caitlin spoke to a police officer that day. She told the officer she slapped Eric, and she heard Eric and the rest of his family say that they did not touch her. She confirmed that she was arrested for domestic assault in the third degree and assault in the third degree and that she successfully completed diversion. Her bruises from the incident were depicted in exhibit 94, pictures taken "the day after Mother's Day"; Eric's father testified that the bruises "[were not] from us."

Caitlin had been in a romantic relationship with Emons. Caitlin denied that Emons ever watched the parties' children by himself. She had paid Emons' niece to watch the parties' children at his house. Caitlin's relationship with Emons ended in the summer of 2022. She had two protection orders against him; the parties' children have not been in Emons' home for "[w]ell over a year."

Under the temporary order entered in January 2021, the parties had parenting time on a week-on-week-off basis, and the parent not exercising parenting time was permitted telephone time between 6 and 8 p.m. for a minimum of 30 minutes on Tuesday and Thursday evenings. According to Caitlin, Eric denied her this time by not answering or he would say the children were with his parents or out doing chores. Eric acknowledged that he had denied Caitlin phone calls; "she will call right at 7:45 and the girls were getting ready for bed" "[a]nd they usually get all worked up when they talk to her on the phone." He said there had been "multiple times" that Caitlin denied him phone calls.

Caitlin testified that when the children returned from Eric's parenting time, their behavior was "terrible," they swore and called her names. When asked if the children "repeat nasty things their father said about [her]," Caitlin answered, "Yes." Caitlin denied that she ever disparaged Eric within the hearing of her children. Eric said he had heard Caitlin call him names in front of the

children during the pendency of this case. He acknowledged calling Caitlin names in front of the children.

According to Caitlin, when it was time to get ready to go to Eric's for his parenting time, the children would get "clingy," not want to leave, and the older daughter often got a stomachache and diarrhea. According to Eric, the girls were clingy before they left him to go to Caitlin's.

Caitlin wanted the children to see their regular pediatrician. However, there had been times that Eric took them to another doctor who put them on medication they were allergic to because the doctor did not have knowledge of their allergies. Caitlin recently sought a different pediatrician in the same practice because their older daughter wanted to see a female doctor; she had not yet seen the new pediatrician. Caitlin testified that "there is a patient portal that [Eric] knows he can use," and "[i]t gives you notifications and an e-mail notification for all the appointments." During his testimony, Eric was asked if he knew there was a patient portal with the doctor's office that he could sign up for to get information; he responded, "I did not." Eric knew the name of the children's previous pediatrician, but "just recently found out that she switched" and he did not know the name of their new pediatrician because "[Caitlin] didn't tell me." Eric did not know the name of the children's dentist because he "wasn't given the information"; however, he said that his mother took the children to the dentist during his last parenting time.

Caitlin took the children to Deb Sheeley for therapy, but during a conversation in May 2022, when Caitlin told Eric the girls had an appointment, he said they would not be going there anymore; this was despite the fact that Caitlin had final say on medical decisions. Caitlin had to stop taking the children to that therapist because of Eric's actions. The girls began seeing a different therapist. The children worked on anger, and the older daughter was still working on anxiety issues.

Sheeley, a licensed independent mental health provider and licensed professional counselor, provided therapeutic services to the parties' daughters, primarily the older daughter, from July 2020 to May 2022; Sheeley received the case from the Child Advocacy Center after the incident involving the older daughter and her half-brother (Eric's son). Sheeley diagnosed the older daughter with an acute stress reaction and an adjustment disorder with anxiety. When Sheeley was asked if she identified Caitlin as being a support person in the older daughter's life, she replied, "Absolutely, yes." When asked if she identified Eric as one of the support people in the daughter's life, she responded, "No."

Sheeley confirmed that the children expressed affection for Caitlin and expressed that they missed her and wanted to be with her. When asked if the children ever told her that they missed their father and wanted to be with him, Sheeley responded, "No." The children had been "worried" about going to their father's home. When asked if there was a time in May 2021 when the older daughter reported that she did not want to go to her father's house because her father gave her some kind of alcohol to drink, Sheeley responded, "Yes." Eric denied giving his daughter alcohol.

Sheeley confirmed that the children reported stories their father told them about their mother that agitated them and affected their relationship with their mother; "They said that he would say things about their mom they [sic] had hurt them [a]nd they didn't know how to respond to it." After Sheeley spoke with the children and had them tell her what they personally knew and questioned the narrative, they calmed down and acted better towards their mother. On one particular occasion, the children came to her with the narrative that Caitlin had left them alone; but

when Sheeley questioned the children about the incident, the children told her they found their mother asleep in a chair. (Sheeley understood that the children woke up and tried to find their mother. When asked if it was her understanding that the children went outside looking for her and that a neighbor took them back home, Sheeley responded, "Yes.") Sheeley confirmed that on one occasion Eric came to her office and said negative things about Caitlin when the children were present. Sheeley acknowledged that the girls expressed a preference to be with Caitlin.

Gertrude Super is Caitlin's mother. Super testified that Caitlin was "a wonderful mother," "a very loving mother." "[Caitlin] loves [her girls] more than anything in the world," "she makes sure they are happy, all their needs are met, that they have a balance of fun . . . and school work." Super observed that at the beginning of Caitlin's parenting time cycle, the children were "clingy" and emotionally dysregulated. Super observed that on the days that the children are getting ready to go back to Eric, they "get more anxious" as the day goes on, "they get cranky, they get sad." Caitlin "is just as calm as she can [sic] with them and tells them that they have to go to their dad[']s and they will be back in a week and it'll be okay and she just tries to calm them."

Caitlin believed it was in the children's best interests for her to have full legal and physical custody. When the children were with her, she was the one that took care of them, they were close to school, and they had a lot of friends and support.

Eric lived with his parents, Randall and Jacqueline Strauss (Randy and Jackie). Eric worked from 6 a.m. to 4:30 p.m., Monday through Thursday, and sometimes there were "mandatory Fridays." When Eric worked during his parenting time, the children were with his parents. (When the parties were married, there were times when Randy and/or Jackie would watch the children when the parties worked.) Randy stated, "Eric is in charge of his girls when he is home," and "[w]hen we are there alone with them we are in charge of the girls." During Eric's parenting time, Jackie takes the children to school in the morning and picks them up after school, and she takes them to any doctor's appointments. They all help the children with their homework. "Eric is a good parent," "[h]e does things with his kids," "sees to it that they are taken care of," and "disciplines them when they need it." The children "cry every time they have to go back to their mother."

Eric sought primary physical custody "[b]ecause of some of the actions Caitlin has done with the kids," and he was concerned about Caitlin leaving the children unattended.

(c) District Court Did Not Abuse Its Discretion

The district court found that both parties were fit and proper persons to be awarded the legal and physical custody of the children, but that it would be in the best interests of the children for their physical custody to be awarded to Caitlin, subject to Eric's reasonable rights of parenting time. The parties were awarded joint legal custody, but Caitlin was given the "final say" on matters related to "education, religion, medical and extra-curricular activities."

In support of its decision, the district court found that Caitlin had been the primary caretaker of the children prior to the filing of the complaint for dissolution and continued to be the one to put more effort into actively parenting the children, whereas Eric's parents were taking the children to and from school, making them meals, and performing many of the parenting functions during his parenting time. The court also found that while Eric expressed a desire to be awarded custody of the children, he was "generally unaware" of the names of the children's current teachers and medical providers and did not use the "remind app" for school or the patient portal for medical

- 7 -

matters. There was evidence that Eric "was resistant" to following the temporary order. He took the children to see medical providers other than the children's pediatrician and refused to allow them to attend therapy with a particular provider even though Caitlin had final say on medical issues under the temporary order. He also denied Caitlin's telephonic parenting time. Caitlin "was more willing to facilitate [Eric's] parenting opportunities and trade days to facilitate the children attending events with [Eric's] family than was [Eric]."

The district court further found that there was "no credible evidence" that Caitlin left the children alone without ensuring that there was a responsible adult in charge, or that they were ever in danger. The court also noted that Eric "had been rough in handling" the children, including "spank[ing] them in anger" and leaving a "mark" on one child by "biting her." Also, Eric "seems to have minimized" his son's sexual abuse of the parties' daughter and was not supportive of continued counseling for that daughter. And Eric "badmouthed" Caitlin to the children. The court stated that,

> With regard to abuse of a household member, while [Caitlin] admitted to slapping [Eric] and that she had completed diversion as a result of the incident, the bruising that [Eric] and his family members left on [Caitlin] from that same incident was much more serious than a slap, and it rose to a level that was concerning. There was also testimony that he was angry and punched holes in the walls.

The court found that "[t]his level of abuse, both of the children and of their mother, combined with the disparaging comments that [Eric] made about [Caitlin], warranted a change in his parenting time." And the court specifically found that it was not in the best interests of the children to continue with a joint custody arrangement.

The district court pointed out that there was "evidence that the parties had difficulty communicating." "One issue that the Court found particularly troubling was evidence that [Eric] was disparaging [Caitlin] to the children." It observed that "the law in Nebraska" provides that the "actions or words by one parent that tend to poison the children against the other parent are a basis for a change of custody to the parent who is not engaging in such behavior." The court found that Eric had "badmouthed" Caitlin to the children, and the evidence "regarding the children's behavior when returning from [Eric's] home made it clear that it was continuing up to the time of trial and had not gotten better after the children stopped seeing the therapist." It went on to state, "This supports a change of custody from joint physical custody to [Caitlin] having primary physical custody."

Eric argues that he "is a loving and dedicated father who should be allowed to exercise the parenting time schedule that had served everyone's interests for the three years preceding trial." Brief for appellant at 16. However, the district court specifically found that a joint custody arrangement was no longer in the children's best interests. The evidence set forth above supports the court's explanation for making that decision. Eric also argues that the court "unfairly placed emphasis on the fact that Eric's parents are present in the home and help with pick-ups and drop-offs to find that he did not put 'effort into actively parenting the children.'" *Id.* at 13. But, as set forth above, the court's finding that Caitlin "continued to be the one to put more effort into actively parenting the children" was only one of many factors considered by the court in determining physical custody.

Based on our review of the record, we cannot say that the district court abused its discretion in awarding physical custody of the children to Caitlin.

### 3. MARITAL ESTATE

Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Parde v. Parde, supra*. The burden of proof rests with the party claiming that the property is nonmarital. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

The equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties. *Parde v. Parde, supra.*

### (a) Farm Equipment Owned by Strauss Hay Farms

Eric assigns that the district court erred in finding that the farm equipment owned by Strauss Hay Farms lost its premarital classification and including the entire value of the equipment in the marital estate.

### *(i) Trial Evidence*

Eric testified that prior to the parties' marriage, he and his father, Randy, owned Strauss Hay Farms, a custom hay operation; Randy owned 51 percent and Eric owned 49 percent. Strauss Hay Farms purchased five pieces of equipment: a 2010 AGCO Hesston 9365 Windrower, a 2010 AGCO 9192 16 RAZR Bar Header, and a 2010 AGCO 7444 Large Square Baler purchased for $228,075 in December 2010, financed by AGCO; a 2005 AGCO DT240A Tractor purchased for $103,500 in August 2011, financed by AGCO; and a 2002 AGCO DT200 Tractor purchased for $67,700 in March 2012, financed by John Deere. The equipment purchases had debt associated with them.

In November 2013, Eric and Caitlin obtained a loan for $307,000 (Jones Bank Loan #XXX331), with payments due annually. Both parties confirmed that the Farm Service Agency (FSA) guaranteed 90 percent of Jones Bank Loan #XXX331. On the FSA Security Agreement, the five pieces of equipment noted above, and a 2008 camper were listed as collateral; and in the agreement, Caitlin and Eric warranted that they were the "exclusive owner[s]" of the collateral.

According to Eric, Jones Bank Loan #XXX331 refinanced notes from Strauss Hay Farms; "I believe it was an AGCO finance loan, the John Deere finance loan, the camper loan, . . . I believe that's it." Caitlin testified that the $307,000 "paid off all the notes that Strauss Hay Farms had, except for one with zero percent financing." And Caitlin confirmed that she and Eric provided Randy enough money to cover every payment on the zero percent interest loan. According to Caitlin, Randy and Eric were not current on their notes between the time of the parties' marriage (June 2013) and November 2013, and it was Caitlin's understanding that at least some of the equipment would have been repossessed if she and Eric had not paid off the notes with the money they borrowed from Jones Bank.

According to Caitlin, Jones Bank Loan #XXX331 was completely paid off during the pendency of the divorce. Exhibits 121 and 122 were printouts from the loan history of the note. Exhibit 121 shows that $101,255.34 was owed in December 2020. Exhibit 122 shows the most recent payment and current status; a payment of $91,732.49 on February 21, 2023, reduced the principal balance of the note to zero. Caitlin testified the February 21 payment came from "a grant called the [Inflation] Reduction Act," "a grant that allowed farmers money to pay off debt that was otherwise not getting paid"; Caitlin worked with someone from the FSA to get those grant funds. According to Caitlin, after the February 21 payment there was still some interest due on Jones Bank Loan #XXX331, but that has since been paid, although not by her.

According to Eric, he and Caitlin started Strauss Ag Enterprises in 2013 or 2014. (The "Certificate of Organization of Strauss Ag Enterprises" received into evidence is dated in 2015 and shows that Eric and Caitlin were each owners "of a 50% membership interest" in Strauss Ag Enterprises). Eric stated that Strauss Hay Farms dissolved, and Strauss Ag Enterprises took over Strauss Hay Farms' vehicles/equipment and the debt associated therewith "[r]ight away." At that time, there was no understanding or agreement between Eric and Randy that Randy would be compensated for the equipment or for what he put into Strauss Hay Farms. Eric said, "[W]e never paid my dad anything off, never g[a]ve him a dime."

Although Eric never had a formal written agreement with Randy for Randy to be compensated for his interest in Strauss Hay Farms, when asked if his father was seeking compensation for his 51 percent interest in the equipment that had been owned by Strauss Hay Farms, Eric replied, "Yes." "He hasn't demanded me [sic] a pay off. He wants to be paid for everything that he has ever put into it, which was all of it." Eric was asked about when the first time was that his father asked to be compensated or reimbursed for any payments he made to the hay operation; Eric replied, "When we started Strauss Ag Enterprises." But when asked if, before filing for divorce, he and Caitlin had discussed paying his father anything for Strauss Hay Farms, Eric replied, "Never."

According to Eric, Randy also contributed to Strauss Ag Enterprises. Eric stated, "There's been times we couldn't make the payments so he helped make payments." Additionally, "[t]here has been times that when we needed another piece of equipment, he went and helped us get the note for it to just borrow the money for it." When asked if he paid Randy back for any of that assistance, Eric replied, "Some of it, but not very much."

Eric claimed that the equipment previously owned by Strauss Hay Farms and refinanced by Strauss Ag Enterprises was partially premarital and partially marital. Exhibit 48 contains his summary of the purchase price, finance amount, payments made, and balance remaining as of the

date of the parties' marriage for each piece of equipment. Exhibit 42 contains his proposed property division.

Eric was asked about the equipment in relation to his 49 percent interest in Strauss Hay Farms. When asked if he accounted for the money still owed on the notes at the time the parties married by assigning 49 percent of those premarital debts in his column of the proposed property division, Eric replied, "Correct." He acknowledged the specific notes no longer existed because they were refinanced by Jones Bank Loan #XXX331. Eric asked the district court to allocate Jones Bank Loan #XXX331 to him with the value as of the date of filing ($101,255.34). When asked if he recognized that a portion of that debt includes the 49 percent of his premarital debt for the three notes that were refinanced, Eric replied, "Correct." Eric was asked if, in his proposed property division, he calculated for the pay down out of that premarital debt in the form of a credit; he answered affirmatively. Eric was then asked if "in recognition of that pay down of the premarital debt, have you also reduced the value of the associated equipment by 49 percent for the same premarital interest?" He answered affirmatively.

On cross-examination, Eric was asked if, when he and Caitlin took over the loans in November 2013, they only took over 49 percent of those loans or if they took over 100 percent of those loans. He replied, "I believe we took over all the loans." When asked if he could think of any reason that Caitlin should only get credit for payment of 49 percent of the loans, Eric replied, "[b]ecause that was my 49 percent." He confirmed that the only reason that he thought she should get credit for 49 percent of the loans that they paid down during the marriage was because that was the percentage of his ownership interest in the old company.

Randy also testified about Strauss Hay Farms' equipment. He said, "I owned the equipment when we went into the [Strauss Hay Farm] LLC." At some point, Eric and Caitlin took over debts associated with the equipment that had been owned by Strauss Hay Farms. "They did it without asking me," "[t]hey went out and refinanced loans without my knowing of it." Randy never entered into an agreement for them to take over the equipment and the loans. And it was not his intent for his interest in the equipment to be given to either Eric or Caitlin.

According to Randy, Strauss Hay Farms owned two tractors (a 2005 AGCO DT240A and a 2002 AGCO DT200), and three other pieces of equipment. He and Eric both signed the retail installment contracts for the equipment and all payments were made on time. Randy claimed that any financial help he gave to Eric and Caitlin was not intended to be a gift. He last made a payment to Jones Bank when "they were going to foreclose or make them sell my equipment, so I wanted to make the payment to get them current." When asked how much of a payment he made, Randy replied, "Boy, seems to me it was like $20,000," but "I would have to go back to my records and see for sure." He later testified that he was "not sure" if the payment was made before the divorce case started.

The five pieces of equipment were in Randy's possession at the time of trial. Randy claimed he was never compensated for the interest he had in the five pieces of equipment. When asked if he still claimed to have an ownership interest in any of the equipment, Randy replied, "Yes, I do." However, he had not taken any steps to protect his ownership interest "[b]ecause that's my son." When asked if he was planning to take steps to protect his interest, Randy replied, "Yes, I am," "I filed against them to get my money out of my equipment," which was, "with everything I've done, probably close to $200,000 to $250,000."

In its decree, the district court noted that an equitable property division is a three-step process. It then stated as follows.

With regard to the first step, which is classification of the property as marital or non-marital, the controversy in this case concerned the two AGCO tractors, Stacker, Windrower, Rotary Head, Baler, Shredder, and 2008 Camper, which had formerly been assets belonging to Strauss Hay Farms. In *Stephens*, the Court held as follows:

"Thus, accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. We agree with many other jurisdictions that the burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation of income. This is the better policy, because it places the burden on the party who has the best access to the relevant evidence." *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582, 595 (2017).

In this particular case, the analysis of what is marital and non-marital is complicated because there was a purchase of premarital assets with marital funds. There was no dispute that [Eric] had owned a 49% interest in Strauss Hay Farms, and that his father, Randy Strauss had owned the other 51% of the entity, Strauss Hay Farms. Strauss Hay Farms, or [Eric] or his father, had owned a substantial portion of the tractors, haying equipment, tools and machinery that was necessary to enable Strauss Hay Farms to operate a hay farming operation, and later to enable [Eric], [Caitlin,] and the entity they formed[,] Strauss Ag Enterprises, LLC, to operate a hay farming operation which was the primary business in which [Eric] and [Caitlin] were both engaged, and the primary source of income for both parties at the time the Complaint for Dissolution of Marriage was filed on December 28, 2020.

[Eric] was a 49% owner of Strauss Hay Farms at the time of the marriage. Strauss Hay Farms had the following equipment at the time of the marriage: 2005 Agco DT240A tractor, 2002 Agco DT 200 tractor, 2010 Agco Hesston 9365 Windrower, 2010 Agco 9192 16 RAZR Bar Header, and 2010 Agco Hesston 7444 Large Square Baler. The premarital liabilities on the equipment at the time of the marriage totaled $242,017.64. The Court is unable to determine the premarital equity [Eric] had in the equipment.

[Caitlin] testified that Strauss Hay Farms was in danger of going bankrupt, and that [Eric] and his father were in danger of losing all their farm machinery and equipment to creditors in 2013 when the parties married. Her testimony, as well as the documents offered at trial, show that the parties took out a loan in November of 2013 for $307,000 (Loan XX[X]331). After they took out that loan, the two AGCO tractors, Stacker, Windrower, Rotary Head, Baler, Shredder, and 2008 Camper, which had formerly been assets belonging to Strauss Hay Farms, or [Eric] or his father were now listed as collateral for the loan. The Court finds [Caitlin's] testimony credible that the loan was used to purchase these assets and to pay off the debt on the farm machinery so that they would not be repossessed and lost. When this occurred, and marital funds were used to redeem these premarital

assets, the assets lost their premarital quality. Stated a different way, under the analysis provided in the *Stephens* case, even though the assets could be traced to premarital assets, the growth in their marital value was due to the active efforts of [Eric] and [Caitlin] in borrowing the funds to purchase the equipment and working to pay down the debt during their marriage. The active efforts of both spouses went into securing the loans to acquire the assets and working to pay the loans and build their hay operation during their marriage. Other assets, including balers, loaders, a driller, a blade and other tools and equipment were purchased by the parties, or by Strauss Ag Enterprises, LLC, once it was incorporated, and the parties had an equal, marital interest in these assets as would normally occur with the acquisition of assets during the marriage.

[Eric] and his father, Randy Strauss, claim that Randy Strauss still has an interest in the equipment, but they did not produce any agreements or other documents to this effect, and the documentary evidence shows that the machinery was collateral used by the marital couple. The parties obtained financing for their hay operation by representing to their creditors that they were the exclusive owners of that collateral. If Randy Strauss had been entitled to an interest in the hay equipment, then that should have been memorialized with a writing at the time the equipment was purchased in 2013. If Strauss Hay Farms still had a value, and some of that should have been attributed to [Eric], there was no evidence of its value, and no way for the Court to determine its value ten years later.

Eric was awarded the equipment, subject to all current and future financial obligations for that equipment.

The decree also states that a payment was made on Jones Bank Loan #XXX331 on February 21, 2023, in the amount of $91,732.49, the funds for which came from a federal grant of money from the Inflation Reduction Act. "Because those funds did not come from either party, it would create a windfall for [Eric] if that grant money was ignored and the amount of his note was not reduced by the amount of the grant that almost entirely paid the note. That grant will be taken into consideration as a reduction in the debt set off to [Eric]."

### (iii) Did the District Court Err?

Eric argues that the district court erred in applying the *Stephens* active appreciation analysis in finding that the farm equipment owned by Strauss Hay Farms lost its premarital classification and then including the entire value of the equipment in the marital estate. "For purposes of this appeal," Eric focuses his argument on two tractors, "the 2002 AGCO DT200 and the 2005 AGCO DT240." Brief for appellant at 18. He was awarded both tractors; in the spreadsheet attached to the decree, the 2002 AGCO DT200 was valued at $24,990 and the 2005 AGCO DT240 was valued at $33,150.

As noted by Eric, the two tractors were purchased before the parties were married for $103,500 and $67,700 respectively; there was debt associated with those purchases. Eric and Caitlin took out Jones Bank Loan #XXX331 in November 2013, and funds from that loan were used to pay off the individual finance contracts for the equipment; both tractors were used as collateral for the Jones Bank loan. In their briefs, the parties agree that at the time of the parties'

loan in November 2013, the outstanding balance on the 2002 AGCO DT200 was $47,050 and the outstanding balance on the 2005 AGCO DT240 was $75,055.

Eric takes issue with the district court's use of the *Stephens* case to find that that "even though the assets could be traced to premarital assets, the growth in their marital value was due to the active efforts of [Eric] and [Caitlin] in borrowing the funds to purchase the equipment and working to pay down the debt during their marriage." Eric argues, "First, there was no evidence that the parties 'purchased' the equipment," "[r]ather, the transaction was more analogous to an informal merger where the parties simply took over the payments on the debts"; "[i]n that case, Eric's premarital interest in the equipment is preserved and only 51% of the value of the equipment would be included in the marital estate." Brief for appellant at 19. "Second, there was no 'growth' in value or appreciation in value to calculate these depreciating assets" and "[i]t would be inequitable to apply an active appreciation analysis to property that depreciates in value." *Id.* at 19. Eric contends,

> The more appropriate treatment for this property is to acknowledge the owning spouse's premarital interest in the equipment and apply the "source of funds" rule to credit the paydown of the premarital debt associated with it. See *Stava v. Stava*, 318 Neb. 32 (2024) ("Under the 'source of funds' rule, acquisition of encumbered property only occurs when and to the extent it becomes unencumbered by paying off the principal of an encumbering loan.")

Brief for appellant at 19.

In *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024), the husband purchased two lots prior to the parties' marriage. One lot encompassed what later became the marital home. On the other lot, the parties built a barn before the marriage. Although the real estate was purchased by the husband before the marriage, the husband and wife were both borrowers on loans encumbering the properties. Through a combination of marital and premarital funds, the loans were paid in full by the time of the dissolution action. The properties appreciated significantly due to market forces during the marriage. At issue was whether a marital interest was acquired by paying down with marital funds the principal balance on the loans.

The Nebraska Supreme Court stated,

> [P]roperty that a party brings into the marriage is usually excluded from the marital estate. We have said that the equity in property at the time of marriage is a nonmarital asset which, if established, should be set aside as separate property. This includes its passive appreciation.
>
> Separate property can become marital property under either "transmutation" or "active appreciation." These two categories are mutually exclusive. Transmutation converts an asset entirely from separate to marital and can occur through commingling if the separate property is inextricably mixed with marital property or with the separate property of the other spouse. Active appreciation converts to marital property only the increase in a nonmarital asset's value due to a contribution of marital funds or efforts. This is opposed to passive appreciation, which is appreciation caused by separate contributions and nonmarital forces.

"Acquisition" of property in the first instance can be an ongoing process. It occurs only as it is paid for, as the real value of property is the equity and not the mere legal title. Under the majority "source of funds" rule, acquisition of encumbered property only occurs when and to the extent it becomes unencumbered by paying off the principal of an encumbering loan. Said property has not been acquired to the extent the principal balance of that debt remains unpaid. Instead, it is acquired when, and to the extent, the parties reduce the principal balance. Thus, the use of marital funds to pay down the mortgage on what was initially separate property acquires the property during the marriage to the extent the principal is paid, creating a proportionate marital interest in that property. This is "regardless of how many different mortgages existed during the marriage."

Id. at 43-44, 13 N.W.3d at 193-94. The court further stated,

While we have not used the term "source of funds" rule, the principles of the majority rule align with our case law.

In *Harris v. Harris*, [261 Neb. 75, 621 N.W.2d 491 (2001)], for example, we recognized that marital payments to a mortgage encumbering a premarital property created marital property that included its passive appreciated value. The marital home had been purchased by the husband before his marriage and had a premarital value of $54,500. The value of the residence had appreciated due to market forces to a value of $82,000 by the time of dissolution. It was unknown what the husband's equity in the home was before the marriage. The parties encumbered the residence with mortgages during the marriage, and it was encumbered in the amount of $60,600 at the time of trial. The district court awarded the house to the husband, subject to the mortgages, for which the husband was ordered to be solely responsible. It did not, however, set it aside as the husband's separate, nonmarital property such that he was entitled to the entirety of the equity in its value at the time of dissolution, and the husband appealed. We affirmed the finding that the house was marital. We explained that the husband was not entitled, as his separate property, to the entirety of the $21,400 in equity of the house at the time of dissolution, because that equity grew, in part, due to mortgage payments made from marital funds. While we agreed that, in theory, any equity in the house before the marriage should have been set aside as the husband's separate property, we observed that the husband had failed to establish what that amount was. As such, the district court did not err in including the entirety of the equity in the residence in the marital estate.

Also apposite to the case at bar is *Eis v. Eis*, [310 Neb. 243, 965 N.W.2d 19 (2021)], wherein we held that the dissolution court did not err in finding that the entirety of an acreage containing the marital home was marital because of marital payments on the mortgage—even though the husband purchased the property before the marriage. The property was subject to two mortgages before the marriage, and these were consolidated during the marriage in a loan under which both the husband and wife were obligated. The consolidated loan was paid with marital funds during the marriage. We observed that the husband and wife regularly borrowed against the property for marital expenses and satisfied those liens with marital funds. While the husband alleged he had contributed $34,000 to the property, worth $575,000 at the time of dissolution, we held the lower court

did not err in finding it entirely marital due to commingling, when the husband presented no evidence regarding the value of the tract separate from its improvements or that the appreciation in value was not due to the wife's investment of $60,000 in home renovation and garage construction.

*Stava v. Stava*, 318 Neb. at 47-48, 13 N.W.3d at 196-97. The Nebraska Supreme Court "expressly adopt[ed] the source of funds rule" and "recognize[d] the district court's discretion in applying the source of funds rule." *Id*. at 49, 13 N.W.3d at 197.

Caitlin argues that "*Stava* was designed to supplement the current body of case law regarding equitable division of property, particularly with regard to the appreciation of real property when a mortgage has been paid down on the property during the marriage, not to undo or overturn the case law on property division in Nebraska as we know it." Brief for appellee at 25. Additionally, "*Stava* applied this 'source of funds' rule to real property, not to machinery. Generally, as [Eric] said in his Brief, real property appreciates in value, but not machinery." Brief for appellee at 27.

Caitlin contends that there was "neither evidence of appreciation or depreciation of the farm equipment, nor [was] there evidence of its value on the date of marriage." *Id*. at 27. She suggests that when the district court cited *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582, (2017), and spoke in terms of appreciation, it did so "not in the context of the asset literally appreciating in value because of market forces, but rather [spoke] of the parties' marital interest in the property growing or appreciating when they used marital funds to acquire the machinery." Brief for appellee at 27. She argues that the district court correctly found that the growth in their marital value was due to the active efforts of both parties in that they borrowed the funds to purchase the equipment and then paid down the associated debt during their marriage. Further, the assets were placed into their marital business in which the parties shared an equal interest. Although she contends case law, including *Stava*, support the court's decision, she claims the source of funds formula in *Stava* does not "fit the facts here." Brief for appellee at 28.

The evidence presented at trial established that the parties borrowed $307,000 and used it to pay off all of the notes that Strauss Hay Farms had, except one with zero percent financing; but they also gave Randy the funds to pay the zero-finance note. The equipment (including the 2002 AGCO DT200 and 2005 AGCO DT240 tractors) was used as collateral for the loans, and Eric and Caitlin represented that they were the sole owners of the equipment. We do not know what the values of the 2002 AGCO DT200 and 2005 AGCO DT240 tractors were on the date of the parties' marriage in June 2013; and like the district court, we are unable to determine the premarital equity that Eric had in the equipment. Additionally, we do not know if any marital funds went towards the payment of the debt prior to when the parties obtained Jones Bank Loan #XXX331 in November 2013. Accordingly, based on the record before us, we cannot say that the district court abused its discretion when it did not set aside any equity in the equipment to Eric as his separate property. See *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001) (husband failed to meet his burden to prove amount of equity he had in residence at time of marriage; district court did not err in including entirety of equity in residence in marital estate).

Eric also argues, but does not assign as error, that the district court should have included "the entire outstanding balance of the loan, regardless of whether the payoff was received from a

grant, because to do otherwise would be to credit Caitlin with the payoff of 49% of that balance that was not reduced with marital funds." Brief for appellant at 20. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party assigning the error. *Uhrich & Brown Ltd. Part. v. Middle Republican NRD*, 315 Neb. 596, 998 N.W.2d 41 (2023). Regardless, we cannot say that the district court abused its discretion in how it determined the balance of the loan.

(b) Marital Residence

Eric assigns that the district court abused its discretion in valuing the marital residence and not including the insurance proceeds for home repairs in the marital estate.

Eric testified that he moved out of the marital residence on August 20, 2020. At that time, the home "needed some work, but it was livable." "The siding was torn off shortly after I left" the home. Eric had not been inside the residence since the complaint was filed. He valued the marital residence at $140,000 after reviewing comparable sales of similar residences on "Zillow," and believed that was a fair value to have assigned to the home.

Caitlin remained in the marital home after the parties separated. She believed that Eric's $140,000 value for the home was closer to its value at the time of trial rather than at the date of filing in December 2020; she believed the value of the home was $70,000 in December 2020. She said that the parties had an appraisal done in July 2018 that valued the home at $70,000. When asked if improvements were made to the home between 2018 and 2020, Caitlin replied, "No, there was none." According to Caitlin, the condition of the home was worse in December 2020 than it was in July 2018, and the value of the home increased after December 2020 due to the work she had done.

Caitlin confirmed that she put a lot of her own money into fixing up the home since December 2020. In July 2021, a tree fell on the house and "it busted up the gutters, one window, some of the soffit facia." Water came in and drywall in the stairwell cracked. Insurance money covered most of that work. There was also water damage to the home in December 2022; water was "everywhere" and "[t]he upstairs was completely destroyed." Insurance paid her $32,762.02 after her deductible.

Caitlin also replaced the siding in late winter, early spring of 2023. She explained that in 2019 when Eric had new windows "put in," the trim was not "put back on." A contractor testified that he went to Caitlin's home in January 2023 to give her an estimate for damage that occurred at her home. The contractor worked on her home from March through May, and prior to that, another contractor had already done some work to the siding on her home. Some of that siding had to be fixed. When asked to describe the condition of the home when he started, the contractor identified numerous problems, including past "shoddy" work where windows and doors were "done incorrectly" and water was leaking around them. Also, "base trim" had been used to "case doors and windows," which was something he had never seen before. The contractor testified that after Caitlin's insurance funds from the water damage were exhausted, there was still more work that needed to be done. He explained why insurance covered some but not all of the work. At the time of trial, Caitlin still owed invoices for $32,254.45 and $26,532.27.

The district court found that the filing date of the marriage dissolution complaint (December 2020) should be used for valuing the parties' assets and debts. The court noted the

- 17 -

2018 appraisal of the marital home reflected the home's value at $70,000, and the evidence reflected that the house required work and repairs. The court found it "implausible that the marital home doubled in value between 2018 and 2020" and accepted the value of the appraisal. "If the house increased in value post separation, it was due to the efforts of [Caitlin] in repairing the deficiencies of the home." The record supports this conclusion.

As to Eric's claim that the district court "awarded Caitlin a windfall in excluding $32,762.02" in insurance proceeds from the marital estate, brief for appellant at 21, we disagree. As noted by Caitlin, "that would have completely ignored the actual damage to the home that had to be repaired." Brief for appellee at 33. After the insurance proceeds were exhausted, Caitlin incurred significant additional costs to repair and improve the home. The court did not abuse its discretion in denying Eric any benefit from Caitlin's post-separation home repairs and improvements.

### (c) Equitable Division

Eric assigns that the district court abused its discretion by failing to equitably divide the marital estate by awarding property to Caitlin for which there was no evidence of value, failing to award property to him, and failing to consider a one-third/two-third division of the net marital estate. More specifically, he argues that the court "awarded $20,000 worth of ammunition, $25,000 of 'miscellaneous farm equipment,' $50,000 of 'farm tools,' and over $60,000 of hay and rye to Eric for which there was no evidence presented at trial." Brief for appellant at 22. Eric also contends that the court failed to include the 2020 federal and state income tax refunds received by Caitlin when the parties jointly filed income tax returns.

### (i) Ammunition

As to the ammunition, we note that it was Eric himself who set the value at $20,000 in his proposed property division and asked that it be awarded to him. He cannot now claim that the district court abused its discretion in using that value when awarding the asset to him. See *Mahlendorf v. Mahlendorf*, 308 Neb. 202, 925 N.W.2d 923 (2021) (party cannot complain of error which party invited court to commit).

### (ii) Miscellaneous Farm Equipment and Farm Tools

On her proposed property statement, Caitlin valued the "Miscellaneous Farm Equipment" at $50,000. She valued the "Miscellaneous Farm Tools" at $50,000, which she believed was less than their fair market value. She said there were "specialty tools" and that they had a "service truck that was completely stocked full of tools." They also had "air compressors, battery chargers, grease guns, cordless tools, a welder . . . all sorts of tools." During her testimony, Caitlin confirmed that the values in the property statement were accurate to the best of her knowledge.

On his proposed property statement, Eric listed the miscellaneous farm equipment and farm tools as "premarital," so no value was provided.

The district court implicitly found that Eric did not meet his burden to prove that the miscellaneous farm equipment and farm tools were premarital. We find no abuse of discretion in the court's decision to treat these assets as marital and to accept Caitlin's valuation for them.

### (iii) Hay and Rye

According to Eric's testimony, the parties were able to harvest their hay in 2020 and some of it (a mixture of alfalfa and grass) was sold while the parties were still together; that sale "should be" reflected in the bank accounts listed on the property statement. On his property statement, he put "none" for the value of 2020 grass hay, alfalfa hay, and standing rye.

When Caitlin was asked about the hay that was on hand in December 2020 when Eric filed for divorce, she replied, "I know for a fact that we had baled . . . all the airport land in 2020, and that hay was stacked at his . . . mother and father's farm," "[w]e had quite a bit of alfalfa," and "[t]here was a bunch of junk hay . . . along the alfalfa side of the property." She described the condition of the hay taken from the airport ground as "pretty nice hay." When asked her opinion as to the value of that hay, Caitlin replied, "There was at least $30,000 worth of hay from just the airport"; this was based on her observation of the hay and her knowledge of the going price for hay at that time.

Caitlin said there was also "grass hay" from "the front" of the field that was a "lot better than the stuff from the back." She estimated there were 23.4 tons worth "probably $140 a ton," for a total value of $3,276. She estimated the back-half of the field being worth about $2,300. She did not believe there was enough "junk hay" to value. Caitlin could not recall the quantity and value of the leftover hay from 2019 "off the top of [her] head," but her calculations from 2021 were included in her property statement.

Caitlin also estimated that there were approximately 44 tons of a "fourth cutting" of alfalfa, which she valued at $7,920 ($180/ton). She valued the 2020 "Grass Hay" at $20,475, the "Alfalfa Hay" at $8,500, and the "Standing Rye" at $38,300.

When asked if he had any idea what the value of the hay was on the date of filing, Eric replied, "I don't." However, to the extent that Caitlin was asking for all of the hay to be awarded to Eric at over $60,000, Eric did not think that would be a fair figure because "most of it never got sold, so we don't really know what the total would be." The hay was not sold because Eric "couldn't deliver it to where it needed to go because [Caitlin] had the semi"--a 2004 Peterbilt--"[t]he only semi . . . that could run." Eric recognized that the 2020 hay that was in existence on the date of filing was now wasted but asked the district court to consider that the reason that it was not sold was that he did not have a vehicle to move the hay.

Caitlin testified that Eric "had a working truck in 2020 the whole time." She was also asked if it was typical for them to move their own hay. Caitlin replied, "[D]epending on who bought it, we would either haul it to them, we frequently had people pick it up, we had a hay grinder come right to his parents farm and [one man] would grind it onto his own semis and haul it off."

The district court awarded the hay and rye to Eric. The court "adopt[ed] the values in the spreadsheet," attached to the decree. In that spreadsheet, the values for the hay and rye were the same as in Caitlin's property statement. We find no abuse of discretion in the court's use of the values noted.

### (iv) Tax Returns

Eric also contends that the district court failed to include the 2020 federal and state income tax refunds received by Caitlin when the parties jointly filed their income tax returns. Caitlin acknowledges that Eric did not receive any of the refunds. According to their tax returns, the

federal and state refunds totaled $6,268. However, Caitlin argues that the income tax refund money that she kept was equal to or less than the COVID stimulus money that Eric kept. "The two balanced each other out, and if anything, the omission of both was in Eric's favor." Brief for appellee at 35.

A Strauss Ag Enterprises business account bank statement showed $7,000 from the IRS on March 17, 2021. When asked if she believed that to be stimulus money, Caitlin said, "Yes." When asked if she received any of the COVID stimulus money that was for her or the children in 2020 or 2021, Caitlin replied, "No." And when asked if she thought it was fair that she kept less than $7,000 of the tax refund if Eric was keeping $7,000 in stimulus money, Caitlin replied, "Yes."

In the Decree, the district court awarded the Strauss Ag Enterprises business account noted above to Eric, and the spreadsheet attached to the decree valued the account as of December 28, 2020. We have reviewed the Decree and the attached spreadsheet, and neither the 2020 tax refunds or any COVID stimulus money were included. However, we agree with Caitlin that her receipt of the income tax refunds and Eric's receipt of the COVID funds "balanced each other out." Brief for appellee at 35.

### (v) Overall Division of Marital Estate

Eric acknowledges that generally a spouse should be awarded one-third to one-half of the marital estate. However, he argues that in this case, he should have been awarded two-thirds of the marital estate with Caitlin receiving one-third "in recognition of the premarital assets he brought into the marriage and the significant assistance from his family in growing and preserving the marital estate." Brief for appellant at 23. Caitlin argues that Eric's reasoning "is not generally . . . supported by the case law," and "[i]f there truly are traceable premarital contributions, then those are dealt with by removing them from the marital estate (when the evidence warrants), not by loosely giving one party more of the marital estate because he could not trace the alleged premarital assets with any precision." Brief for appellee at 35. We find no abuse of discretion in the district court's decision to equally divide the marital estate.

### 4. ATTORNEY FEES

In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Seemann v Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

The district court found that Caitlin prevailed on most of the issues in this case. And "[i]n light of the results obtained and [Eric] maintaining that certain property was owned by his father, which was contrary to the facts and the law" it awarded Caitlin $5,000 in attorney fees. The court denied Eric's request for attorney fees.

Each party attributed increased costs to the other party. Caitlin claimed Eric dragged the case out when he would not sign a "global settlement" they had reached through mediation in November 2022. When asked if he recalled backing out of the agreement and refusing to sign the settlement documents, Eric replied, "Yes, I do." Although he denied being asked to sign documents or that he was presented with documents ready to sign. Eric also claimed that discovery was

complicated and that Caitlin failed to participate in the discovery process in good faith and that she willfully withheld information and supplied false information at her deposition. He argues, "Although Caitlin prevailed on more issues at trial, this behavior should not be sanctioned by any award of attorney fees." Brief for appellant at 25.

There were numerous motions and claims asserted by both parties during the pendency of the underlying action. We cannot say that the district court abused its discretion by awarding Caitlin $5,000 in attorney fees.

## 5. CONTEMPT

Eric claims the district court abused its discretion by failing to find Caitlin in contempt for violating the anti-hypothecation order and failing to require her to reimburse him for the sale of his premarital property. His argument specifically focuses on Caitlin's sale of a 1983 Peterbilt cabover which he bought for $5,000 with funds he inherited. When asked if it was his position that the 1983 Peterbilt should not have been included in the marital estate, let alone sold by Caitlin, Eric responded, "Correct." He and Caitlin discussed selling the 1983 Peterbilt before they "even thought about splitting up," but did not discuss selling it after the non-hypothecation order was entered.

Caitlin confirmed that she sold a 1983 Peterbilt cabover truck for which she and Eric held a joint title. She said they purchased the vehicle "12 or 15 years ago"; she disagreed with Eric's testimony that the vehicle was purchased with his inheritance. When asked if Eric agreed that she could sell it, Caitlin responded, "Numerous times." She was then asked if she was aware that Eric had repeatedly asked for that vehicle to be returned to him; Caitlin responded, "He texted me that and the answer was, 'you can come get it,'" "[a]nd he never came and got it in three and a half years." Caitlin sold the vehicle in early 2023 for $10,000, and Eric was not involved in the transaction.

Caitlin was asked if Eric sold a truck without her permission while this action was pending; she answered, "Yes." "We owned a 1996 [Kenworth] . . . and he sold it to someone . . . I think it was in 2021," "[a]nd I don't know how much he sold it for." According to Caitlin, Eric sold that vehicle before she sold the 1983 Peterbilt. She denied having any knowledge that Eric was going to sell the vehicle before he sold it. She acknowledged that she did have to sign the title for the sale, but that was "[t]o avoid conflict in a public place." Caitlin said that (during mediation) she agreed that "he could sell a truck that was in repossession by the bank" and "[t]he only truck at the time we had a lien against was the 2004 Peterbilt"; she denied that she agreed he could sell the 1996 Kenworth. When asked about selling the 1996 Kenworth, Eric stated, "Uhm, pretty much just said that -- well, the bank told us we needed to sell something to pay the loan to get caught up on payments, so I told her I was going to put it up for sale and I put if [sic] up for $28,500 and that's what we got for it."

In considering this evidence, the district court found, "[Caitlin] clearly sold the truck . . . for that, she is in contempt. But . . . [Eric] also sold the truck." Accordingly, the court said it was not going to find Caitlin in contempt. Eric's attorney asked the court to reconsider the vehicles and argued that Eric's sale of the 1996 Kenworth was "[n]othing like" Caitlin's sale of the 1983 Peterbilt. However, the court stated, "I'm going to deal with it in the overall division of property and debt." "I am not going to find her in contempt for what I've heard so far."

Subsequently, in its decree, the district court stated, "[Eric] sold the 1996 Kenworth . . . and the $28,000 he received from the sale shall be set off to him"; "[Caitlin] sold the 1983 Peterbilt . . . and that will be set off to her at a value of $10,000 which she received from the sale."

Contrary to Eric's claim otherwise, it was not "uncontested" that he purchased the 1983 Peterbilt with inheritance money. See brief for appellant at 23. The district court's decision to find that Caitlin was not in contempt was not an abuse of discretion, and neither was its handling of the sales of the 1983 Peterbilt and the 1996 Kenworth in its overall division of the property.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's determination that Caitlin was not in contempt regarding the sale of a vehicle, and we affirm the district court's June 27, 2024, decree in its entirety.

AFFIRMED.