IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

HANEY V. HANEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SUSAN S. HANEY, APPELLEE,

V.

ROBERT A. HANEY, APPELLANT.

Filed July 29, 2025.    No. A-24-651.

Appeal from the District Court for Sarpy County: NATHAN B. COX, Judge. Affirmed.

Gregory A. Pivovar for appellant.

Wesley S. Dodge for appellee.

PIRTLE, BISHOP, and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Robert A. Haney appeals from the Sarpy County District Court's decree dissolving his marriage to Susan S. Haney. He challenges the district court's award of alimony and its valuation of the marital estate. We affirm.

## II. BACKGROUND

Susan and Robert were married on June 20, 1992. Susan filed a complaint for dissolution of marriage on May 5, 2023, seeking alimony, an equitable division of the parties' assets and debts, and an award of attorney fees. Robert filed an answer and counterclaim for marriage dissolution. At the time of trial, Susan was 59 years old, and Robert was 63.

### 1. TEMPORARY ALIMONY

On May 16, 2023, Susan filed a motion seeking temporary alimony from Robert. Following a hearing, the district court entered an order awarding Susan temporary alimony in the amount of

$1,200 per month for 4 months. The order directed that Robert make payments in June, July, August, and September, "or until further orders of the Court."

On September 13, 2023, Robert filed a "Motion to Terminate Temporary Alimony," along with an exhibit showing the parties' joint bank account statements from a federal credit union for June and July. He alleged that these statements show withdrawals totaling $17,000, "none of [which] were made by [him]." Consequently, the "account [was] empty," and he was receiving "regularly issued notices of overdrafts." Robert further claimed that Susan had "continued her uncontrolled spending habits" and that "she spent over $800.00 on clothes and cosmetics" from mid-July to mid-August.

On January 17, 2024, the district court entered an order denying Robert's motion to terminate temporary alimony. It required him to continue paying temporary alimony to Susan in the amount of $1,200 per month until further order.

## 2. Trial

Trial was held on December 12, 2023, and March 29, 2024. Both Susan and Robert testified. In addition, Nicholas Dizona, a certified real estate appraiser, testified about the value of the parties' home. A house appraisal and other exhibits were received into evidence.

### (a) Susan's Testimony

Susan testified that she and Robert were married for 31 years and had one child together. She explained that throughout the marriage, she worked full time and "never left a job until [she] had [another] job available." In fact, she worked two jobs "off and on" throughout the marriage, including while Robert attended school to obtain his "CDL license to be a truck driver." At the time of trial, Susan was employed by an affordable housing organization and earned $18.50 per hour, which amounted to approximately $38,000 per year. She stated that she took this position after leaving her previous higher-paying job at a food company due to health concerns. She suffers from osteoarthritis in both her legs and knees and explained that she had to get out of the "cold" and "wet" environment at the food company.

According to Susan, she took on most of the parenting responsibilities during the marriage because Robert "was working." She took their child to doctors' appointments, sporting events, and school activities. She also attended parent-teacher conferences. She stated, "pretty much anything [our child] needed[,] I provided." Robert did not participate in these activities "very often." He went to "[m]aybe one or two" sporting events and did not attend any doctors' appointments or parent-teacher conferences.

Susan received an inheritance from her mother who passed away in 2021. She estimated the amount to be "maybe 110, 120," and denied that it was $140,000. She explained that she used the funds for both her and Robert. She stated, "I've given Robert a lot of money for different things over [the] last few years." Specifically, she "[gave] him money to put down on his pickup truck" and to "plate" his motorcycle. She also assisted his mother in refinancing her home to prevent her from losing it. Moreover, Susan used part of her inheritance to upgrade the marital home, paying for "carpets, flooring, paint, some furniture, some updates on both of the bathrooms, [and] some updates outside." She also "helped pay bills."

Approximately $69,000 of Susan's inheritance was deposited into a joint account at a federal credit union. Susan believed the account was solely in her name and did not learn that Robert's name was also on the account until she went to the bank to retrieve paperwork for the divorce proceedings. She stated that Robert never withdrew any funds from the federal credit union account. She also emphasized that "it was always the understanding" that she would "keep [her] inheritance[,] and [Robert] would keep his."

The parties separated on May 1, 2023. Susan claimed that Robert did not help her with "anything" during that time, so she made multiple withdrawals from the federal credit union account to cover living expenses. Initially, Susan stayed at an extended-stay hotel for around $540 per week. After about 2 months, she found a one-bedroom apartment to rent for $1,275 per month, plus additional costs. She stated that she had to purchase furniture and other items for the apartment because "Robert would not allow [her] to take anything from [their] home." She added, "He had set up cameras there and was threatening me with the police and all kinds of other things if I took anything from the house."

Regarding the division of marital assets, Susan proposed that Robert retain ownership of the house, the Chevy Silverado, the Harley Davidson Trike motorcycle, the four-wheeler, the John Deere riding lawn mower, and other personal property. She suggested keeping the Chevy Blazer for herself, along with various personal items listed in exhibit 16. These items included miscellaneous kitchenware, furniture, holiday decorations, and jewelry. She explained that she was amenable to selling the rest of their personal property and splitting the proceeds.

Finally, Susan said that she needed alimony "to help supplement [her] bills." At the time of trial, her monthly income was $2,136, while her monthly expenses totaled $4,205. This expense figure represented a $170 reduction from the $4,375 listed in exhibit 7, as Robert had taken over dog-related expenses. Based on this shortfall, Susan requested alimony in the amount of $1,200 per month for the first 36 months, followed by $750 per month for the next 48 months.

(b) Dizona's Testimony

Dizona testified that he has been an appraiser for 25 years and has appraised "[t]ens of thousands" of houses. He also stated that he has appraised between 10 and 20 houses in the parties' subdivision over the past 5 to 10 years.

Dizona appraised the parties' marital home. He testified that the home is 14 years old, but its condition is comparable to a home that is approximately 10 years old. He noted two minor issues -- slight warping of the kitchen floor and minimal settlement, which he described as common for most homes in the area. In his opinion, these issues reflected normal wear and tear and did not indicate significant damage. He characterized the home as being "well maintained" and in "very good condition."

To determine the market value, Dizona compared the marital home to a similar property and adjusted for differences between the two. These adjustments were informed by a sales analysis and discussions with a real estate agent. Based on this, he concluded that the market value of the home was $399,000.

### (c) Robert's Testimony

Robert testified that he has worked full time as a truck driver for the past 26 years. He confirmed that he did not work while attending school to obtain his CDL and that Susan worked two jobs during that period. At the time of trial, Robert earned $25.70 per hour. Over the past 3 years, he reported earning at least $90,000 annually and estimated his income for the most recent year to be approximately $100,000. Robert typically worked between 70 and 72 hours per week during the marriage and often worked substantial overtime. He sometimes worked as many as 105 hours in a single week. Recently, however, his hours were reduced to approximately 60 per week due to company-wide changes. Robert further testified that, due to health issues, he may be reassigned to a desk position working "just 8 hours a day, Monday through Friday." He explained that he suffers from Type 2 diabetes, which affects both his legs and eyesight. Consequently, Robert believed his income would likely decrease in the "near future." However, he acknowledged that his employer has not yet decided whether his position will change.

Robert regretted that his work hours, "[a] lot of times . . . 105 hours a week," impacted his ability to be more involved in his son's life. He explained that he did the best he could and that his family "never went without anything."

Robert has "paid every bill [related] to the home and utilities since 2014." He claimed that Susan only paid for groceries every other week, as well as her own car payments. In addition to the regular bills, Robert paid for various home improvements, such as a patio cover, house painting, driveway mud jacking, landscaping, and finishing the basement. Further, he used an inheritance of approximately $4,000 to $5,000 from his father to clear past-due utility and cable bills.

Robert confirmed that Susan received an inheritance from her mother. He stated that Susan told him she was depositing a portion of her inheritance into the federal credit union account and that she had added his name to it. He explained that Susan wanted him to have access to the account "in case something happen[ed] to [her]."

Regarding the division of marital assets, Robert expressed a desire to keep the marital home, primarily for the convenience of his elderly dog and his own health needs. He disagreed with Dizona's valuation of the marital home and testified that a Zillow estimate of $378,600 more accurately reflected the property's current market value. Nonetheless, he acknowledged that the Zillow estimate did not take into account the improvements he and Susan had made to the interior of the home.

Robert specifically identified the personal property he wished to keep, as listed with valuations in exhibit 17. These items included a diecast car collection, Chevy Silverado, Harley Davidson, "4Wheeler," basement bedroom set, 65-inch television, "Harley bar/stools," and tools. Although not listed in exhibit 17, he also wanted to keep the John Deere riding lawn mower. Robert agreed that certain larger items, such as the refrigerator and stove, should remain with the house and be reflected in its appraised value. In addition, he believed that any property neither party wanted should be sold, with the proceeds split equally between them.

Contrary to Susan's testimony, Robert asserted that she was free to take any personal property she wished when she moved out of the marital home. He noted that she left "closets full of clothes . . . at the house" and confirmed that she could "have all of that."

Finally, Robert's monthly expenses included a house payment of $1,726, utilities averaging $300, and a car payment estimated to be between $580 and $650. He also spent about $200 a week on groceries. Robert did not want to continue paying alimony due to his reduced hours at work and his health conditions. He stated, "I'm just not going to have the money."

### 3. DECREE

The district court entered its decree on August 2, 2024. Robert was awarded the marital residence and was ordered to pay Susan $108,500 within 60 days, representing her one-half share of the equity in the home. In dividing the marital estate, the district court relied on exhibits 6 and 16, both submitted by Susan, which outlined her proposed property distribution. Based on these exhibits, the court valued the marital estate at $346,848 and ordered Robert to pay Susan an equalization payment of $141,624. This amount included the $108,500 for her share of equity in the home and an additional $33,124 to equalize the remainder of the marital estate. Each party was awarded the personal property in their possession, and each was held responsible for any associated debt.

The district court also awarded Susan alimony in the amount of $1,200 per month for 36 months, followed by $750 per month for 48 months. Payments were to commence on the first day of the month following the entry of the decree.

## III. ASSIGNMENTS OF ERROR

Robert assigns, restated, that the district court erred in (1) determining the duration and amount of alimony and (2) valuing and dividing the marital estate.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. ALIMONY

The district court ordered Robert to pay alimony to Susan in the amount of $1,200 per month for 36 months, followed by $750 per month for 48 months. Robert assigns that the district court "abused its discretion when [it] *reduced* the duration and amount of . . . alimony." (Emphasis added). Brief for appellant at 4. However, this apparent writing error was corrected in the argument section of his brief where he argued that the court "abused its discretion in setting both the term and amount of the alimony." *Id*. at 11. We address Robert's argument accordingly. See *State v. Jennings*, 308 Neb. 835, 957 N.W.2d 143 (2021) (although imprecise, appellant's assignment of error sufficiently informed appellate court of issues and gave notice to appellee of arguments).

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage,

(3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.*

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Wiedel v. Wiedel, supra*. The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Susan and Robert were married for 31 years. Throughout the marriage, Susan worked full time and, at times, held two jobs to help support the family. She also served as the primary caregiver for their child, handling nearly all parenting responsibilities. At the time of trial, Susan earned approximately $2,136 per month, while her monthly expenses totaled $4,205. She testified that she left a higher-paying job due to osteoarthritis in her legs and knees, and she accepted a lower-paying role to accommodate her health needs. Susan requested alimony in the amount of $1,200 per month for 36 months, followed by $750 per month for 48 months.

Although Robert expressed concern about his future ability to pay due to health concerns, the record shows that he has earned over $90,000 annually for the past 3 years and has continued working full time. When asked whether he anticipated a decrease in income in the near future, he answered, "Yes." However, when asked whether his employer had told him that, he replied, "Not yet. I have asked, and they haven't decided yet."

Robert agrees that alimony is appropriate but contends it should be a lower amount for a shorter period of time. He argues that Susan's need for alimony is "manufactured by [her own] actions" and claims that "she [has] made no effort" to lessen her expenses or discretionary spending. Brief for appellant at 13. Robert further points to the inheritance Susan received from her mother and argues that she "had nearly $140,000.00 from which she could set up retirement funds." *Id.* While it is true that property acquired by inheritance is generally excluded from the marital estate, a court may still consider a party's inheritance in determining whether alimony is appropriate. See *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

Here, the record establishes that Robert's income is almost three times Susan's income. Also, Susan used a substantial portion of her inheritance for the benefit of the marital household. She paid for home improvements, assisted with family expenses, and provided financial support to Robert and his family. After the parties separated, she relied on her remaining inheritance to secure housing and cover necessary living expenses. While there may be health issues that will impact Robert's ability to maintain his current earnings in the future, the evidence presented to the district court did not reflect any reductions at the time of trial.

Based on the evidence in the record before us, we cannot say that the district court abused its discretion in determining the duration and amount of alimony awarded to Susan.

## 2. MARITAL ESTATE

Robert assigns error to the district court's valuation and distribution of the marital estate. The court ordered Robert to pay an equalization amount of $141,624, of which $108,500 was tied to Susan's share of the equity in the marital home and the remainder ($33,124) was based on other marital assets. Notably, Robert does not specifically challenge how assets were allocated; rather, he primarily argues that the court abused its discretion by accepting all of Susan's proposed valuations and "ignor[ing] any arguments put forward by [Robert]." Brief for appellant at 16.

### (a) General Propositions of Law

Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023).

In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

In a marital dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property or nonmarital portion of the property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties. *Id.* Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

### (b) Marital Home

Robert contends the value of the parties' home should have been valued at $378,600, a value he obtained on "Zillow." Brief for appellant at 17. This would leave "a gross equity of $195,458," of which Susan's one-half share would be $97,730. *Id*.

The district court adopted the valuation provided by Dizona, a certified real estate appraiser, who assessed the home's value at $399,000. Dizona described the home as well-maintained and in very good condition. To determine its market value, he compared the home to a similar property and adjusted for differences between the two. These adjustments were informed by a sales analysis and discussions with a real estate agent. Robert acknowledged that the Zillow estimate did not reflect all improvements made to the property.

The district court was entitled to rely on the expert's appraisal over Robert's Zillow estimate; we find no abuse of discretion regarding the court's valuation of the marital home.

### (c) Personal Property

Based on Robert's valuations of personal property, he suggests that the property awarded to each party was a "wash." Brief for appellant at 17. However, aside from the house, Susan submitted evidence showing Robert being awarded assets totaling $98,048, whereas Robert's evidence valued his assets at only $17,175.

At trial, Susan submitted exhibit 6, which outlined the assets she believed should be awarded to Robert, with individual valuations assigned to each item. In addition to the equity in the home ($217,000) and the Chevy Silverado ($11,000; $41,000 value minus $30,000 debt), she identified the following values: Harley Davidson Trike ($34,000), "ATV (Quad Runner)" ($6,000), John Deere riding lawn mower ($500), diecast car collection ($2,000), tools ($3,000), tool storage units ($2,000), power washer ($300), checking account ($9,537), savings account ($18,461), and various home furnishings ($11,250). These items totaled $315,048 ($217,000 home equity and $98,048 in other assets). In that same exhibit, Susan identified the equity in her Chevy Blazer as $6,000. In exhibit 16, Susan detailed her personal property totaling $25,800, which included various furniture, household items, and jewelry. No amounts were identified for any bank or credit union accounts. Together, Susan's exhibits reflected values of items in her possession totaling $31,800. It is evident that the district court relied upon Susan's values to reach the equalization amount of $141,624 (Robert's property ($315,048) minus Susan's property ($31,800) equals $283,248, which divided by 2 equals $141,624).

In exhibit 17, Robert identified and valued the personal property he wished to keep. His list includes the Harley Davidson Trike ($6,000; $22,000 value minus debt of $16,000), "4Wheeler" ($3,000), diecast car collection ($0/"Gifts"), basement bedroom set ($525), 65-inch television ($300), "Harley Bar/Stools" ($400), and tools ($400). He also testified that he wished to keep the John Deere riding lawn mower ($300), bringing his total requested personal property value to $10,925. Exhibit 17 also reflected a value of $36,250 for the "2021 Silverado." (Susan's exhibit reflected a debt of $30,000 against this vehicle.) Thus, home equity aside, where Susan allocated and valued marital property awarded to Robert at $98,048, Robert valued it at $17,175.

Robert challenged the district court's reliance on Susan's valuations but offered little to no evidence supporting his alternative values. He testified that many of the diecast cars were gifts, though he did not specify how many. Susan similarly provided no testimony or evidence about whether any portion of the collection was gifted. While Robert acknowledged purchasing some of the cars himself, he nonetheless assigned the entire collection a value of $0.

Further, Robert valued the Harley Davidson Trike at $6,000 despite testifying that he had paid $19,000 for it plus a trade-in. In addition, he recently used the fully paid-off trike as collateral to borrow $15,000 from his brother.

For other personal property items, Robert's valuations were substantially lower than Susan's. He valued the four-wheeler at $3,000, explaining that similar models were listed on Facebook Marketplace and that such items tend to depreciate. However, he did not provide any evidence to substantiate this claim. The same is true for the remaining items; Robert's testimony consisted primarily of general statements or estimations without supporting evidence. As a result, we cannot say that the district court abused its discretion in crediting Susan's valuations over Robert's.

(d) Other Adjustments

Robert contends that Susan's equalization amount should be reduced by $34,619 based on Susan spending "one half of the joint account . . . by herself without any regard for [Robert]." Brief for appellant at 17. He also requests a credit for the $16,214 he spent on mortgage and utility costs for the marital home during the pendency of the proceedings.

Robert points out that Susan withdrew $34,619 from the federal credit union account, which held funds from her inheritance. Gifts and inheritances, even when received during the marriage, are presumed to be nonmarital. *Parde v. Parde, supra*. Susan testified that she deposited her inheritance money into the joint account under the mistaken belief that the account was solely in her name. She further stated that Robert never withdrew any funds from the account. According to Susan, she used the inheritance funds to cover household expenses, make improvements to the marital home, and support herself after the parties separated. Robert presented no evidence that he contributed to or was otherwise entitled to a share of those funds. We cannot say that the district court abused its discretion by not attributing Susan's withdrawals to the marital estate.

Robert also contends that he should have received credit for $16,214.08 in mortgage and utility payments made during the pendency of the proceedings. The record shows that Robert continued to live in the marital home after the parties separated in May 2023 and he alone made the mortgage and utility payments. At trial, he offered exhibit 18, which showed monthly mortgage payments of $1,726.76 per month, plus $300 per month in utility costs, for a total of $2,026.76 per month in "BILLS PAID FOR MAINTENANCE OF HOME." Robert calculated 8 months of payments totaling $16,214.08, representing the period of time from separation until trial.

The utility costs associated with the marital home only benefited Robert since he continued to reside there. These are postseparation living expenses that would not be factored into the marital estate. To the extent Robert is suggesting that any reduction in the mortgage balance after the parties separated should have been set off to him when determining the marital interest in the home's equity, there was no supporting evidence in that regard presented at trial. Although Robert offered exhibit 18 showing payments made, there was no evidence as to how much, if any, the balance on the home mortgage was reduced from May to October 2023 (date of mortgage balance statement received into evidence at trial). Accordingly, based on the evidence presented, we cannot say that the district court abused its discretion in failing to award Robert credit for the postseparation expenses reflected on exhibit 18.

In summary, upon our de novo review of the record, we find no abuse of discretion in the district court's valuation and division of the marital estate.

## VI. CONCLUSION

For the reasons set forth above, we affirm the district court's August 2, 2024, decree dissolving the parties' marriage.

AFFIRMED.